

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV–14–213

| | |
|---|---|
| GERALD STOCKSTILL<br>APPELLANT | **Opinion Delivered** August 27, 2014 |
| V. | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT<br>[NO. JV-12-111] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILD<br>APPELLEES | HONORABLE BARBARA ELMORE, JUDGE<br><br>AFFIRMED |

## ROBIN F. WYNNE, Judge

Gerald Stockstill appeals from the Lonoke County Circuit Court order that terminated his parental rights to his son D.S.2, who was then nine years old. He argues on appeal that the circuit court erred in finding that his son was adoptable, that his son would be subject to potential harm if placed in his custody, and that the "subsequent factors" ground for termination had been proved by clear and convincing evidence. We find no clear error and affirm.

The Arkansas Department of Human Services (DHS) removed D.S.2 and his two younger siblings from their mother's custody in May 2012. In the probable-cause order, appellant was ordered to submit to paternity testing as to D.S.1 and D.S.2.[1] In the

---

[1]Initially, appellant was named the putative father of both D.S.1 (born in 2006) and D.S.2 (born in 2005), but paternity testing revealed that he is the father only of D.S.2.

adjudication order, the court found (and the mother stipulated) that the children were dependent-neglected due to inadequate supervision and environmental neglect. The goal of the case was set as reunification.

At a review hearing on September 25, 2012, the results of paternity testing were introduced into evidence and appellant was found to be the father of D.S.2. The court ordered that appellant would not have any visitation with D.S.2 until he completed parenting classes, and "then the court will entertain an agreed order as to his visits." The court noted that appellant had started parenting classes.

The review order entered following a December 18, 2012 hearing makes no mention of appellant other than to include a drug screen as one in a list of items received into evidence, and he was apparently not present for that hearing. Appellant was present for the February 12, 2013 review hearing, and at that time, a certificate of completion for appellant's parenting classes was entered into evidence. The court found that he had completed parenting classes and submitted to random drug screens and home visits. The court stated that his visits were to be addressed at the next hearing. At the next hearing on April 16, 2013, appellant was granted supervised visits once a week for one hour. The court stated in its order, "Any outburst and the visits shall cease immediately."

The next hearing was the permanency-planning hearing on April 30, 2013. At that time, the mother testified that she wished to voluntarily relinquish her parental rights, and the court changed the goal of the case to adoption. As to appellant, the court made the following findings: he had completed parenting classes, had submitted to and had negative drug screens and had visitation with D.S.2; appellant did not have a home of his own and

only had part-time employment. The court apparently increased his visitation to supervised visits twice a week for an hour and a half per session.[2]

On June 3, 2013, DHS and the attorney ad litem filed a joint petition for termination of parental rights. As to appellant, the petition alleged that under the "subsequent factors" statutory ground[3] he had been established to be the legal father of D.S.2, did not have appropriate housing or sufficient income to care for his child, and had not appropriately addressed his anger issues. At the termination hearing on October 22, 2013, Lakisha Tatum testified that she had been the Lonoke County DHS family-service worker assigned to this case since it was opened in May 2012. She testified that appellant came to the probable-cause hearing in May 2012 and to the initial staffing. There was a period of time when DHS lost contact with appellant for a couple of months. Under the case plan, he was to obtain and maintain employment and maintain stable housing. During this case, appellant went through periods of unemployment, then worked part-time at Hardee's before obtaining his current job at Southern Tire Service. As for housing, he was living with roommates at the time of the hearing, and Tatum testified that she did not believe it would be suitable for a child. She acknowledged that appellant had submitted to drug screens and that drugs had not been an issue in the case; she also testified that he had completed parenting classes. She

---

[2]Handwritten portions of the order are illegible.

[3]Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2013) provides:

That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

testified that appellant did not currently have transportation and that he had missed several visits, some before and some after he had gotten his new job. Tatum testified that appellant had anger and animosity toward everyone involved in the case, which caused a barrier to working with DHS and making progress. She stated that D.S.2 already had some anger and aggression issues and it was important for him to have a controlled, calm environment. Tatum testified that she did not feel that appellant was a fit parent at this time and that D.S.2 should not have to wait any longer for permanency. Under cross-examination by appellant's attorney, Tatum testified that the only anger issue referenced in the court reports was the same incident in the April 4, 2013 staffing; appellant had been offered no services to address anger issues. Tatum testified that she had not personally been to appellant's residence, but the issue she had with it was that there was not a separate bedroom for D.S.2. She testified that she was relying on the secondary case worker for information regarding the home and the missed visits. Tatum testified on recross by the attorney ad litem that the reason it took so long for visitation to begin after the DNA results had been obtained in July 2012 was appellant's failure to attend hearings and failure to actively participate in the case.

Appellant testified that he had lived in a house in Judsonia with the homeowner since June 2011 under a verbal lease. He testified that he rented a room and that there was currently another bedroom available. Appellant stated that he had been unable to afford a residence of his own previously, but his new job would allow him to obtain his own residence after the first of the year. Regarding his participation in the case, he explained that he had missed the hearings in June, July, September, and December 2012 because of transportation issues and work conflicts; furthermore, he believed at that time that the

4

mother would be getting the children back. He testified that he began truck-driving school in July and currently made good money as a transfer truck driver, working from 6:00 a.m. to 4:00–5:00 p.m. Monday through Friday. He testified to the close relationship between the siblings and the reasons why he had not seen his son since 2009 or established paternity before it was established in this case.

Lisa Martin, a White County family-service worker, testified that she was the secondary case worker assigned to appellant in December 2012. She testified that the house appellant lived in was a two-bedroom, with the owner occupying one bedroom and appellant sleeping on the couch; the second bedroom had recently become available because the owner's daughter had gone to jail. The only issue Martin had with the home was with cigarette smoke; it was otherwise appropriate. She testified that appellant planned to move to his own home before the homeowner's daughter moved back to the house. She testified that no background check had been performed on the homeowner/roommate because she had not received a request for one, but it was not appellant's responsibility to get a background check. She testified that appellant had missed a couple of visits the past summer because he overslept, and he missed other visits because he had just started a new job and could not take time off. Regarding any anger issues, Martin testified that she had heard appellant vent frustration but he had never demonstrated anger, even verbal anger. She testified that appellant had obtained his CDL or "certified licensed driver" status; she believed he had sufficient income to rent a home for himself and D.S.2 in Judsonia. She testified that appellant was not deficient in any of the four items in the case plan—drug screens, stable housing and employment, and parenting classes.

An adoption specialist testified that all three siblings were currently placed together in a foster home and that a search revealed ten families that were available to adopt a sibling group of three. There were no apparent factors that would prohibit adoption.

In the termination order entered December 3, 2013, the circuit court made the following findings:

> The Department has proven by clear and convincing evidence the following grounds:
>
> . . . .
>
> c. As to Gerald Stockstill, under Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juveniles to the custody of the parent is contrary to the juveniles' health, safety, or welfare and that despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juveniles to the custody of the parent. Subsequent to the filing of the original petition, Gerald Stockstill was established to be the legal father of [D.S.2]. Gerald does not have appropriate housing or sufficient income to care for [D.S.2]. He also has not appropriately addressed his anger issues.
> . . . .
>
> 8. The Court specifically finds:
>
> a. The children have been out of the home of their parents for eighteen (18) months.
>
> b. This case started in May of 2012, yet Gerald Stockstill did not get actively involved in this case until February of 2013.
>
> c. Mr. Stockstill does not have stable housing.
>
> d. Mr. Stockstill missed visits with [D.S.2] because he slept late.
>
> e. There were two DHS caseworkers trying to help Mr. Stockstill. They consistently visited the home and gave advice on corrections that were needed to make the home appropriate for [D.S.2]. Mr. Stockstill failed to heed the advice given and 18 months into this case still does not have stable and appropriate housing for [D.S.2].
>
> f. The Court finds that Gerald Stockstill could have gone out last week and rented a place appropriate for his child, but did not do it and as of the date of this termination hearing, does not have a suitable home for his child.
>
> 9. In making this determination to grant the petition for termination of parental rights in this case, the Court has considered the potential harm, specifically addressing the effect on the health and safety of the juveniles caused by returning the juveniles to the custody of their parents. The Court finds that return of the juveniles

SLIP OPINION

to the custody of the parents could harm the juveniles' health and safety because the parents are not appropriate to care for the juveniles. The parents do not have an appropriate lifestyle. The parents are not a fit and proper parent for the juveniles. It is in the best interests of the children that parental rights be terminated.

10. [D.S.2, D.S.1, and A.H.] are adoptable and are very likely to be adopted.

It is from this order that appellant appealed.

Our standard of review in termination–of–parental–rights cases is well settled. When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Osborne v. Ark. Dep't of Human Servs.*, 98 Ark. App. 129, 252 S.W.3d 138 (2007). Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Id.* Parental rights, however, will not be enforced to the detriment or destruction of the health and well–being of the child. *Id.* Pursuant to Ark. Code Ann. § 9–27–341(b)(3), the facts warranting termination of parental rights must be proved by clear and convincing evidence. Clear and convincing evidence is the degree of proof that will produce in the fact–finder a firm conviction regarding the allegation sought to be established. *Id.* When the burden of proving a disputed fact in equity is by clear and convincing evidence, the question that we must answer on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id.* Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Id.*

Termination of a parent's rights must be based on clear and convincing evidence that it is in the best interest of the children, considering the likelihood that the children will be adopted if the parent's rights are terminated and the potential harm caused by returning the children to the custody of the parent. *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104, 426 S.W.3d 520; Ark. Code Ann. § 9-27-341(b)(3)(A). The court must also find one of the grounds outlined in Arkansas Code Annotated section 9-27-341(b)(3)(B). In this appeal, appellant challenges the trial court's finding of best interest, both as to D.S.2's adoptability and as to the potential harm of placing him in appellant's custody, and also argues that DHS failed to prove the "subsequent factors" statutory ground by clear and convincing evidence.

Regarding adoptability, appellant points out that the adoption specialist did not indicate whether she had input data regarding the characteristics of these particular children when she ran her search, and that the case worker testified that the children "will be adoptable" with "counseling for a long period of time." This court has held that adoptability is but one factor that is considered when making a best-interest determination and that no factor must be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the children. *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, at 5, 431 S.W.3d 364, 367–68 (citing *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, at 6, 385 S.W.3d 285, 288). Here, DHS presented evidence from a case worker, an adoption specialist, and the CASA volunteer that the children were adoptable, and appellant has not demonstrated any error on this point.

8

Appellant also challenges the court's finding that D.S.2 would be subject to potential harm if placed in his custody. Essentially, he points out the ways that he complied with the case plan and the fact that he and his son had a bond. He also finds fault with DHS's handling of his case. However, given appellant's uncertain housing situation, missed visitation, and failure to participate in the early part of the case, we cannot say that the trial court clearly erred in finding that D.S.2 would be subject to potential harm if placed in appellant's custody.

Finally, appellant argues that DHS failed to meet its burden of proving the "subsequent factors" statutory ground. He contends that he was "lumped in" with the other parents in the termination order as being unfit, but he acknowledges that the primary case worker had provided such testimony.[4] Regarding the services offered to him, appellant contends that DHS failed to communicate with him about the case, he was not appointed counsel until late in the case, the quality of the documentation by the primary case worker in the court reports was poor, and there were services that he could have been offered but was not. He takes particular issue with the court's findings regarding his housing, income, and failure to address his anger issues. We might be inclined to agree with certain narrow points appellant raises. For example, despite maintaining that appellant had "anger issues" based on the staffing incident in April 2013, DHS apparently never offered appropriate services to address those issues, such as anger-management classes. However, prior to the termination hearing, appellant did not attempt to challenge multiple findings by the circuit

---

[4]He seems to argue that the secondary case worker should have been found more credible.



court that DHS had offered appropriate family services. His failure to challenge those findings precludes us from now reviewing them on appeal. *Fredrick v. Dep't of Human Servs.*, 2010 Ark. App. 104, at 11, 377 S.W.3d 306, 312.

We find no clear error, and we affirm the termination of appellant's parental rights.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Suzanne Ritter Lumpkin*, Arkansas Public Defender Commission, for appellant.

*Tabitha Baertels McNulty*, DHS–Office of Policy and Legal Services; and *Chrestman Group, PLLC*, by: *Keith Chrestman*, for appellees.