SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-14-622

| | |
|---|---|
| TIFFANY FOX<br>APPELLANT | **Opinion Delivered** November 19, 2014 |
| V. | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. J-2013-196-D/N] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILD<br>APPELLEES | HONORABLE THOMAS E. SMITH, JUDGE<br><br>AFFIRMED |

**PHILLIP T. WHITEAKER, Judge**

Appellant Tiffany Fox appeals the order of the Benton County Circuit Court terminating her parental rights to her son, D.C.[1] Her primary argument on appeal is that the circuit court erred in finding that termination was in the best interest of D.C.; specifically, she contends that there was insufficient evidence that D.C. would be subject to potential harm if returned to her custody. We find no error and affirm.

Our standard of review in termination-of-parental-rights cases is well settled. When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Stockstill v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 427; *Osborne v. Ark. Dep't of Human Servs.*, 98 Ark. App. 129, 252 S.W.3d

---

[1] D.C.'s father, Ismaile Castro, also had his parental rights terminated; however, he is not a party to this appeal.

138 (2007). Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Stockstill, supra.* Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* With these standards in mind, we turn to the facts of this case.

The Arkansas Department of Human Services exercised an emergency hold on five-year-old D.C. in March 2013, the day after his infant brother, N.F., was killed by Tiffany's husband, Travis Fox. Travis was also accused of killing another of Tiffany's infant sons, T.F., in 2011.[2] The circuit court adjudicated D.C. dependent–neglected six months later. The bases for adjudication were Travis's confession that he caused the deaths of D.C.'s siblings by physical abuse, Tiffany's failure to take reasonable action to protect N.F. from physical abuse by Travis, and her failure to adequately supervise D.C. and N.F. by leaving them in Travis's care. The court concluded that the existence of the potential for abuse was known or should have been known by Tiffany, and her failure to supervise "placed both juveniles at risk of harm and resulted in the death of N.F." The court further found that return of custody to Tiffany was not in the best interest of the child. In reaching this conclusion, the court looked to the opinion testimony of Dr. Martin Faitak. Dr. Faitak stated that returning D.C. to Tiffany's care would be "actively dangerous for the juvenile," due to Tiffany's borderline personality disorder and her inability to recognize the reality of situations.

---

[2]Travis Fox was eventually convicted of murder in both children's deaths and was sentenced to life in prison.

However, the court did set the goal of the case as reunification at that time and ordered DHS to provide services to Tiffany.

Subsequent to adjudication, the court took periodic review of the services provided and Tiffany's progress toward the goal of reunification. By court order, DHS provided the services of counseling, parenting classes and domestic-violence classes. With regard to counseling, Tiffany began her sessions but did not make significant progress in therapy. Tiffany completed parenting classes and had been attending domestic-violence classes. Despite this attendance, however, an incident occurred wherein the Rogers Police Department received a disturbance call from Tiffany's boyfriend, Aaron Mcabee, that she had choked him during an altercation. As a result of Tiffany's limited progress, the court changed the goal to adoption at permanency planning.

DHS filed its petition for termination of parental rights in March 2014, alleging four statutory grounds.[3] The petition also alleged that D.C. was adoptable[4] and that he was at high risk of potential harm if returned to Tiffany because she had not accomplished her case goals and "continue[d] to be emotionally unstable, continue[d] to engage in dangerous behavior, and . . . demonstrated little insight into her behaviors which put D.C. at risk."

Following a hearing, the circuit court found that DHS had established the necessary statutory grounds and that termination was in D.C.'s best interest. With regard to the

---

[3]Because Tiffany does not challenge the statutory grounds on appeal, these will not be recited with any specificity.

[4]Tiffany does not challenge the finding that D.C. is adoptable.

SLIP OPINION

potential harm of returning D.C. to Tiffany's custody, the court found not only that Tiffany had not accomplished her case plan goals, but also that she "continues to be emotionally unstable, continues to engage in dangerous behavior, and has demonstrated little insight into her behaviors which put D.C. at risk." It is from the court's termination order that Tiffany brings the instant appeal. Tiffany's primary argument on appeal is that the circuit court clearly erred in finding that D.C. would be subject to potential harm if he were returned to her custody.

Termination of a parent's rights must be based on clear and convincing evidence that it is in the best interest of the child, considering the likelihood that the child will be adopted if the parent's rights are terminated and the potential harm caused by returning the child to the custody of the parent. *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104, 426 S.W.3d 520; Ark. Code Ann. § 9-27-341(b)(3)(A). Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Stockstill, supra*. When the burden of proving a disputed fact in equity is by clear and convincing evidence, the question that we must answer on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Id*.

We conclude that the trial court correctly found that D.C. would be subject to potential harm if returned to Tiffany. Dr. Karen Farst opined that the injuries sustained by D.C.'s siblings at or around the times of their deaths were not injuries that one would expect to find in non-ambulatory infants, and, moreover, they were injuries that would certainly be noticeable to a caregiver. In response, Tiffany denied ever seeing bruises or other injuries on either child. She acknowledged Dr. Farst's testimony that the injuries would have been visible to the children's caretaker, but she maintained that she did not see any bruises on the children except for one on N.F.'s head that she said he had caused himself. We must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id*. Accordingly, we find no error in the court's conclusion that Tiffany demonstrated little insight into her behaviors that put D.C. at risk.

Likewise, we find no error in the court's conclusion that Tiffany continued to be emotionally unstable. Dr. Faitak performed two psychological exams on Tiffany: one in April 2013 and another in March 2014. After his first examination, Dr. Faitak felt that Tiffany was unstable and that it would be "actively dangerous" for her to have children with her. Given her diagnosis of borderline personality disorder, Dr. Faitak recommended that D.C. not be placed with Tiffany until she admitted to her problems and her need for help. By the time of the second evaluation, Tiffany seemed to have made a moderate amount of progress: she appeared less anxious, less depressed, and more stable. Dr. Faitak still felt, however, that she continued to need therapy and was concerned that she still did not take responsibility for D.C. being in foster care. He opined that, assuming she was currently making progress in her

therapy, she would still need at least two more years of active therapy. Despite the data that she was progressing and improving as a result of therapy, Dr. Faitak said that he nonetheless did not think it would be safe to place a six-year-old child in her home.

Dr. Faitak's opinion was supported by other evidence. Leigh Wade, a social worker with Ozark Guidance Center, testified that she had conducted individual and family therapy with Tiffany and D.C. Wade noted that Tiffany had made progress in some respects, but "not the progress I would expect with the therapy that we have done." Laura Byler, a mental-health therapist at DaySpring Behavioral Health, saw Tiffany twice: once at her intake assessment and once in a regular appointment. Byler said that she spoke to Tiffany about her children, and Tiffany did not take "any sort of responsibility for why [D.C. was] in foster care." Byler felt that Tiffany was just "going through the motions" with her counseling and had missed scheduled appointments. Although Tiffany was cooperative during her sessions, she made "little to no progress" with her treatment.

We further find no error in the court's conclusion that Tiffany continued to engage in dangerous behavior. Wade stated that Tiffany had not progressed with her understanding of the role of a parent as protector. Tiffany had also not taken any sort of responsibility in her sessions for D.C. being in care, nor had she taken any responsibility for the deaths of her other two children. Wade said that Tiffany lacked understanding about domestic violence, and her failure to grasp the dangers and realities of a domestic-violence situation could cause a child in her care to not be safe. Specifically, with regard to Tiffany's progress, Wade testified that her

6

ability to recognize a violent relationship, and to take responsibility for her child's safety, is still not there. I don't see enough evidence that would make me assess that that situation is safe at this time. I'm telling you, at this time, I feel it is unsafe to send D.C. home.

Byler noted that, although Tiffany said she needed to work on her relationships, she never acknowledged that she needed to work on her domestic-violence issues.

In considering the potential harm caused by returning the child to the parent, the court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms. *Collins v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 90. Additionally, the risk for potential harm is but a factor for the court to consider in its analysis. *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark. App. 255, 148 S.W.3d 780 (2004).

In this case, the evidence showed that Tiffany never acknowledged her role in failing to protect her two other children from being killed by her husband; she had ongoing, unresolved issues regarding domestic violence; she failed to participate in therapy and counseling that were designed to help her understand and address those issues so that she could provide a safe home for her child; and all of her mental-health professionals agreed that she would need at least one or two more years of active participation in consistent, intensive therapy before any of them would feel comfortable in saying that D.C. could be safely returned to her care.

A parent has a duty to protect a child and can be found to be unfit even though she did not directly cause her child's injury; a parent must take affirmative steps to protect her

children from harm. *Vasquez v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 575, 337 S.W.3d 552. Recently, in *Drake v. Arkansas Department of Human Services*, 2014 Ark. App. 475, 442 S.W.3d 5, this court affirmed the termination of a father's parental rights and upheld the circuit court's potential-harm finding where the father persistently denied the danger posed to his children by his wife's mental-health issues. In the instant case, Tiffany failed to recognize the necessity of ongoing therapy and counseling and refused to acknowledge her role as protector of her son. Therefore, it was not clearly erroneous for the trial court to determine that termination was in D.C.'s best interest due to the potential threat of harm to him if returned to Tiffany's care.[5]

Affirmed.

PITTMAN and GLOVER, JJ., agree.

*Shannon L. Holloway*, for appellant.

*Tabitha B. McNulty*, County Legal Operations; and *Chrestman Group, PLLC*, by: *Keith L. Chrestman*, for appellees.

---

[5]Tiffany raises a brief argument wherein she suggests that the circuit court should have extended the time for termination because she was complying with the case plan and making progress toward reunification. She failed to assert below, however, that she should have been granted additional time to work on her case plan, and the argument is therefore not preserved for our review. *See Cushman v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 3 (noting that this court will not consider arguments raised for the first time on appeal); *Gilmore v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 614, 379 S.W.3d 501.