

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–16–361

| | |
|---|---|
| CARL JASON JACKSON<br>APPELLANT | **Opinion Delivered** September 28, 2016 |
| V. | APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT<br>[NO. JV2015-05] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILDREN<br>APPELLEES | HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Appellant Carl Jackson appeals the order of the Conway County Circuit Court terminating his parental rights to his daughter, J.J., and his son, C.J.[1] J.J. and C.J. are both Jackson's children with a common mother, Ycenea Adams.[2] On appeal, Jackson argues that the circuit court erred in finding that termination of his parental rights would be in the best interest of the children; he also argues that the circuit court failed to make the requisite finding of statutory grounds. We find no error and affirm.

---

[1] Although the two children were initially the subjects of separate proceedings—J.J.'s case was assigned case number JV2014-59, and C.J.'s case was assigned case number JV2015-05—the two termination hearings were held at the same time, and the cases were consolidated by agreement of the parties at that time.

[2] Adams also had a daughter, A.C., with a man named Derrick Chatman. Adams's parental rights were terminated as to all three children, and A.C. was placed in Chatman's custody. Adams is not a party to this appeal, and any issues pertaining to A.C. are irrelevant to this appeal, except insofar as A.C. and J.J. were taken into DHS custody at the same time.

SLIP OPINION

## I. *Background*

The Arkansas Department of Human Services (DHS) removed J.J. from Adams's custody in early September 2014, alleging that Adams had subjected the child to abuse, threat of harm, failure to protect, inadequate supervision, and environmental neglect. At the time of J.J.'s removal, Adams was pregnant with C.J. DHS filed a dependency-neglect petition against both Adams and Jackson in the circuit court. At the probable-cause hearing, the court found probable cause based on Adams's stipulation, ordered DHS to conduct a home study on Jackson, and also adjudicated Jackson to be the father of J.J. The circuit court ordered Jackson to, among other things, submit to random drug screens, attend and complete parenting classes, submit to a psychological evaluation and to a drug–and–alcohol assessment, and to submit to and successfully complete inpatient/outpatient drug treatment. The court also set the matter for an adjudication hearing on November 20, 2014.

Prior to the adjudication hearing, several things happened. Jackson filed a petition for custody of J.J. Adams gave birth to C.J., and she gave temporary custody of C.J. to Jackson outside of DHS or court proceedings. At the adjudication hearing, the court adjudicated J.J. dependent-neglected; placed temporary custody of J.J. with Jackson; specifically ordered Jackson to cooperate with DHS, including allowing home visits and submitting to drug tests; and set the matter for a review hearing on March 26, 2015. The court also recognized Adams's placement of C.J. with Jackson.

Despite the agreement between Jackson and Adams concerning C.J., Jackson had concerns about Adams's contact with the child. On January 6, 2015, Jackson reported to

DHS that he felt the baby was in danger with Adams. DHS filed a petition for ex parte emergency custody and dependency-neglect with respect to C.J. The petition alleged that in the preceding months, Adams had been homeless and had been inadequately supervising the baby. The court subsequently adjudicated C.J. dependent-neglected in March 2015 based on Adams's stipulation and based on the prior finding that a sibling was dependent-neglected. The court also adjudicated Jackson the father of C.J. based on stipulation. The court reserved disposition in the matter until the review hearing of March 26, 2015, previously scheduled in J.J.'s case.

At the review/disposition hearing, J.J. was removed from Jackson's custody. Jackson was suspected of providing fake clean urine samples during DHS drug tests, and he failed a hair-follicle test that showed he was positive for cocaine and THC. During his testimony, Jackson admitted he had not been truthful about his drug use. Accordingly, the court found Jackson's testimony to be lacking in credibility and directed him to return J.J. to DHS's custody that day. In addition, the court ordered Jackson to submit to and complete a drug-and-alcohol assessment and follow all recommendations, and it set J.J.'s case for a permanency-planning hearing (PPH) in July. As to C.J., the court continued custody with DHS and set the matter for review in July, at the same time as the PPH for J.J.

At the PPH/review hearing, the court changed the goal for both children to adoption. In doing so, the court specifically noted that Jackson's drug-and-alcohol assessment revealed a "high level of deception"; that Jackson had refused to submit to random drug screens; and that, while he had attended nearly all of his visitations, which went well, he had failed to



provide documentation that he had completed parenting classes. The court authorized DHS to file a petition for termination of Jackson's parental rights.

DHS filed separate petitions to terminate Jackson's parental rights. With respect to J.J., DHS alleged the "twelve-months, failure to remedy" ground, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Repl. 2015); the "failure to provide significant material support" ground, Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(*a*); and the "subsequent factors" ground, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*). With respect to C.J., DHS alleged both "subsequent factors" and that Jackson had submitted the child to aggravated circumstances, in that a determination had been made by a judge that there was little likelihood that services to the family would result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*).

Following a hearing, the circuit court granted the petitions to terminate Jackson's parental rights. Regarding J.J., the circuit court found that DHS had proved the "twelve-months, failure to remedy" ground and the "subsequent factors" ground. As to C.J., the court found that DHS had proved the "subsequent factors" and aggravated-circumstances grounds. In addition, the court found as to both children that termination of Jackson's parental rights was in their best interest, noting the risk of potential harm and the likelihood that the children would be adopted. Jackson timely appealed.

## II.  *Standard of Review*

Our standard of review in termination-of-parental-rights cases is well settled. When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Fox v. Ark. Dep't of Human Servs.*, 2014

Ark. App. 666, 448 S.W.3d 735; *Stockstill v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 427, 439 S.W.3d 95. Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Fox*, *supra*. Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.*

Termination of a parent's rights must be based on clear and convincing evidence that it is in the best interest of the child, considering the likelihood that the child will be adopted if the parent's rights are terminated and the potential harm caused by returning the child to the custody of the parent. *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104, 426 S.W.3d 520; Ark. Code Ann. § 9-27-341(b)(3)(A). In addition, the order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). *Henson v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 225, 434 S.W.3d 371.

Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Fox*, *supra*. When the burden of proving a disputed fact in equity is by clear and convincing evidence, the question that we must answer on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Id.*

SLIP OPINION



### III. *Potential Harm*

In his first point on appeal, Jackson argues that there was insufficient evidence presented at the termination hearing to support the court's findings that J.J. and C.J. would be at risk for potential harm if returned to him. In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Gulley v. Ark. Dep't of Human Servs*, 2016 Ark. App. 367, ___ S.W.3d ___; *Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability the child receives in a permanent home. *Collins v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 90.

We find no error in the circuit court's potential harm finding. Jackson was aware that he had been ordered multiple times to submit to random drug screens, and he agreed that he had not done so at every request. Jackson acknowledged that he obtained his long string of negative drug screens because he had been substituting urine, and he admitted that he had not been truthful with the court about his drug usage in the past. He further conceded that he had been given custody of J.J. in November 2014, but he tested positive for cocaine in March 2015. Even after losing custody of J.J., his caseworker noted that Jackson tested positive for cocaine in a hair-follicle test in September 2015.

Despite this evidence, Jackson argues that some of his missed drug screens were justifiable. He contends that he missed many drug screens based upon his work schedule and his inability to control when DHS wanted a sample. DHS, on the other hand, argues that

Jackson refused to provide samples upon request. Jackson also notes that he had completed outpatient treatment at Quapaw House[3] and had passed his drug screens at that facility. However, George Weaver, the director of treatment services at Quapaw House, acknowledged that the person conducting the drug screen does not actually observe the subject urinating, and he conceded he was unaware that Jackson had admitted to providing false urine samples to DHS. Jackson also argues about the positive strides he has made in addressing his drug issues. He notes Weaver's testimony that Jackson appeared "motivated and determined" while in treatment. Weaver was unaware, however, of the positive hair-follicle test in September 2015.

We cannot find error in the court's potential-harm ruling. This court has consistently noted that continuing drug use demonstrates potential harm to children. *See Eldredge v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 385; *Davis v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 815, 370 S.W.3d 283; *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark. App. 255, 148 S.W.3d 780 (2004). Moreover, credibility determinations are for the circuit court to make, not this court. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 9–10, 444 S.W.3d 366, 372. Here, the circuit court specifically found the caseworker's testimony about Jackson's drug use to be credible, and we are unable say that the court was clearly erroneous in finding that the children would be at risk of potential harm if returned to Jackson's custody due to his ongoing drug usage.

---

[3]Jackson was dismissed from the program on his first attempt for noncompliance, but he had completed treatment on his second attempt just a few weeks prior to the hearing.

SLIP OPINION

IV. *Adoptability*

In his second argument on appeal, Jackson argues that the circuit court erred in finding that C.J. was adoptable and that there were no barriers to adoption.[4] While the likelihood of adoption must be considered by the trial court, that factor is not required to be established by clear and convincing evidence. *Duckery v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 358, at 5–6 (citing *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495).

Jackson argues that the only evidence regarding adoptability came from the caseworker, Michelle Mallett, who "testified on the one hand that C.J. is severely developmentally delayed and then on the other [hand,] within minutes stated that she believes there are no barriers to C.J. being adopted." We have previously held that a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Duckery*, *supra*. Despite this, Jackson contends that at no point during the termination hearing was evidence introduced as to the nature of C.J.'s developmental impairments or that potential adoptive parents had expressed interest in adopting C.J. Therefore, Jackson concludes, the circuit court's findings regarding adoptability were not supported by clear and convincing evidence.

In support of his argument, Jackson cites *Brown v. Arkansas Department of Human Services*, 2015 Ark. App. 725, 478 S.W.3d 272. That case, however, is easily distinguishable. In *Brown*, there was *no* evidence of adoptability, a fact that DHS conceded on appeal, nor was there a finding by the circuit court that "this absence of evidence of adoptability made 'no

---

[4]Jackson does not challenge the adoptability finding as to J.J.



legal difference' to the ultimate decision of what was in the child's best interest." *Brown*, 2015 Ark. App. 725, at 5, 478 S.W.3d at 276.

In the instant case, on the other hand, caseworker Mallett testified that although C.J. was "pretty severely developmentally delayed," she saw no barriers to his adoption because his developmental delays were not "so severe as to prevent some other family from loving C.J. and caring for him. We've caught him fast enough. He's young enough. With the right therapies, we should be doing pretty well if we can keep him stable for a while." Thus, her testimony was not as self-contradictory as Jackson suggests; moreover, even if it were, the fact that a child has developmental delays does not negate a finding that a child is adoptable. *See Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, 434 S.W.3d 378 (affirming circuit court's findings regarding adoptability of child despite the severity of child's medical diagnosis). The circuit court's decision on C.J.'s adoptability was thus supported by the evidence and is therefore affirmed.

## VI. *Statutory Grounds*

Jackson's final point on appeal concerns the court's findings on the statutory grounds. He does not challenge the factual basis of the circuit court's findings regarding the statutory grounds. Rather, he argues that the circuit court "failed to cite its grounds for termination of . . . parental rights as required by statute."

Arkansas Code Annotated section 9-27-341(b)(3) requires that an order terminating parental rights must be based on a showing of clear and convincing evidence as to one or more of the nine grounds for termination listed in section 9-27-341(b)(3)(B). *See Dornan v.*

*Ark. Dep't of Human Servs.*, 2014 Ark. App. 355. Here, the circuit court's order with respect to J.J. states as follows:

> The court finds the failure to follow the court orders for random drug screens, the falsifying drug screens, the failure to make himself available for home visits, his dishonesty with the court and DHS, and his continued positive drug screens are all *subsequent factors* which manifest [Jackson's] incapacity or indifference to remedy the subsequent issues or factors or rehabilitate his circumstances, which prevent the placement of the juvenile in the custody of the father, Carl Jason Jackson. The court further finds *aggravated circumstances* exist, as there is little likelihood additional services would result in a successful reunification.

(Emphasis added.) The court made identical findings with respect to C.J.

Jackson's argument that the court "failed to cite its grounds for termination of . . . parental rights as required by statute" is factually incorrect. The language of the circuit court's order plainly tracks the statutory language of Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(*a*) (subsequent factors) and (ix)(3)(B)(*i*) (aggravated circumstances). Jackson appears to be arguing only that the court did not list a specific statutory section or subsection in its order. However, he cites no authority for the proposition that the circuit court's order must specifically recite the subsection number of the statutory provision on which the court relied. We have repeatedly stated that we will not consider arguments that are unsupported by convincing legal authority or argument unless it is apparent without further research that the argument is well taken. *See Carter v. Cline*, 2013 Ark. 398, 430 S.W.3d 22; *Webber v. Ark. Dep't of Human Servs.*, 334 Ark. 527, 528, 975 S.W.2d 829, 829 (1998); *Campbell v. State*, 2016 Ark. App. 119, 484 S.W.3d 279. Given the fact that the circuit court's language mirrored the statutory language, Jackson's argument strains credulity. We therefore affirm on

this point without addressing the evidence supporting the court's findings regarding the statutory grounds.

Affirmed.

GRUBER and HOOFMAN, JJ., agree.

*Law Office of Kathryn L. Hudson*, by: *Kathryn L. Hudson*, for appellant.

*Andrew Firth*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.