Cite as 2023 Ark. App. 294

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-22-761

|  |  |
|---|---|
| | Opinion Delivered May 17, 2023 |
| CHEYENNE WORKMAN AND JESSE LUDWIG | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| APPELLANTS | [NO. 72JV-20-404] |
| V. | HONORABLE DIANE WARREN, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | |
| APPELLEES | AFFIRMED |

## WENDY SCHOLTENS WOOD, Judge

Cheyenne Workman and Jesse Ludwig appeal the Washington County Circuit Court's order terminating their parental rights to their minor child (MC). Workman argues that the court clearly erred in finding statutory grounds supported the termination of her parental rights. Ludwig contends that the court's finding that it was in the child's best interest to terminate his parental rights was clearly erroneous because there was a less restrictive alternative through placement with MC's paternal aunt. We affirm the termination of both Workman's and Ludwig's parental rights.

On May 15, 2020, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect after taking a seventy-two-hour hold

on MC (who was six years old at the time) on May 12. In the affidavit attached to the petition, a DHS representative stated that MC had been living with his maternal grandmother and step-grandfather, Poppa, for almost a year at the time of removal because Workman was homeless and unable to provide safe housing for herself and MC. The DHS representative stated that MC reported that Poppa hit him with a "belt with a big gray buckle" when MC broke the rules. On the day of the incident that prompted initiation of this case, MC reported that Poppa had "slammed" the belt on his legs when he was sitting on the couch because MC "wasn't leaving the animals alone." MC said that sometimes Poppa left marks on his chest and face, but "they went away."

The DHS representative also stated in the affidavit that Workman said that she could not afford a place on her own and did not live with her mother and MC because "no one likes my boyfriend (Quinton Fisher)." Workman acknowledged that she was aware of Fisher's criminal history, which included arrests for second-degree battery and criminal mischief, but she said they had been together four years at the time MC was removed and that MC and Fisher "get along good." On May 19, the circuit court entered an order granting the ex parte motion for emergency custody.

In an order entered on September 1, MC was adjudicated dependent-neglected due to abuse, neglect, and parental unfitness. The circuit court found that MC's step-grandfather had struck MC, leaving marks that were "more than transient," that Workman "had a duty to ensure that [MC] was safe and had failed to do so," and that Workman was "not stable."

The goal of the case was set as reunification with a fit parent and a concurrent goal of adoption.

After a December 2020 review hearing, the circuit court found that Workman was in minimal compliance with the case plan, indicating that she had obtained and maintained housing and employment but had not completed a psychological evaluation, participated in individual counseling, or consistently visited MC. The court noted that Workman said she had not called the caseworker because "it slipped her mind" and she had "been busy." Ludwig did not attend the hearing, and the court found he had not complied with any of the court's orders or the case plan. The court continued the concurrent goals of reunification and adoption.

The court held a permanency-planning hearing on May 11, 2021, and found that the goal of the case should be authorizing a plan to return MC to Workman. The court recognized that MC was removed from a caretaker for physical abuse, which Workman did not cause, but reiterated that Workman could not have custody of MC at that time because she could not meet his needs. The court found that Workman had a house, a car, and employment and that she had completed parenting classes. The court also warned Workman that if she intended for Fisher to be a part of her life going forward, he needed to agree to be part of the case plan. The court referenced Workman's testimony that she and Fisher had been in a relationship for four years and that they were not living together but were still dating. The court noted that there was no evidence that demonstrated Workman was able to pay for housing without Fisher's help. The court also expressed concern for MC's safety

3

if placed with Workman, stating that she must maintain her progress and demonstrate the ability to protect him and keep him safe from harm. The court ordered DHS to develop a graduated visitation plan to achieve this goal. Ludwig failed to attend the hearing, and the court found he had not complied with any of its orders or the case plan.

After holding a review hearing on November 2, which Workman and Fisher both attended, the court entered a review order on December 1 finding that MC should remain in DHS custody because the parents were unfit. This order provided that MC had been on a trial home placement with Workman from October 6 through October 31 that ended when DHS discovered that Fisher was living in the home and acting as a babysitter for MC in violation of the court's orders and without DHS approval. The court found that Workman had not followed the safety plan at home, had missed therapy visits between her and MC, and had not been forthcoming with DHS about who was living in the house. The court stated it was "less concerned" about whether Workman and Fisher were "sleeping together" and more concerned with "his presence" in the home with MC. The court further stated that it did not understand how Workman and Fisher were not in a relationship because Fisher testified that he provided groceries and "whatever was needed." The court found that the problem with Fisher being around is that MC "does not feel safe" around him. The court expressed concern in its order regarding the testimony of MC's therapist, Haley Bowles, who said that MC was told to lie about Fisher being in the home. The court forbade Workman from cohabitating with anyone but her legal spouse, forbade her from allowing anyone of the opposite sex in the home during overnight hours, and ordered DHS to include Fisher in

4

the case plan. Ludwig did not attend the hearing, and the court again found that he had not complied with any of the court orders or the case plan.

The court held another permanency-planning hearing in February 2022 at which it changed the goal of the case to termination of parental rights and authorized a plan for adoption. The court found that Workman had only minimally complied with the case plan and court orders, stating that while she had a house, car, and employment and had participated in counseling, she had not consistently attended visitation, maintained contact with DHS, or demonstrated an ability to keep MC safe from harm. The court found that she had not made significant measurable progress toward remedying the conditions that led to MC's removal or the conditions that prevent placement of MC in her custody. Ludwig did not attend the hearing, and the court again found that he had not complied with any of the court orders or the case plan.

On March 25, DHS filed a petition to terminate the parental rights of Workman and Ludwig, alleging the statutory grounds of twelve months failure to remedy, Ark. Code Ann. § 9-27-341(b)(3)(B)(i) (Supp. 2021)—custodial parent for Workman and noncustodial parent for Ludwig; subsequent factors, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*); and aggravated circumstances, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*). The court held a termination hearing on July 19.

At the hearing, Workman admitted that in the past three years, she had lived with MC for only twenty-five days. She said that he had been living with his grandmother and step-grandfather for nearly a year because she was homeless. During the two years this case

had been pending, she lived with MC less than a month during the trial placement. However, she also testified that since this case began, she had maintained a job, a house, and transportation; participated in family counseling with MC; attended two individual counseling sessions; visited MC regularly; and maintained a strong bond with MC.

Workman further stated that she had no idea where Fisher was, denied being in a relationship with him, and said their five-year relationship ended at the beginning of the year. She acknowledged that MC had seen a text from Fisher on her phone at a recent therapy session and claimed that Fisher still sends her messages because "that's just him." She admitted that Fisher had appeared at a previous hearing several months earlier in May, but she said she had no idea why he did not attend the July termination hearing. She testified that she would not allow MC around Fisher if MC were returned to her custody.

Ludwig testified that he had been either in a county jail or prison since October 2020 except for nine months during 2021 when he was living in Little Rock. He admitted that the last time he had seen MC was in June 2020. He said he had not participated in the case or had much contact with DHS until he returned to prison in January 2022. He said since that time, he had been in regular contact with Haley Miles, the caseworker. Ludwig said he had provided Miles the name of his sister, Cassie Holt, as a possible placement option for MC. He said Cassie was going through a divorce and was attempting to get a place of her own. He said he had not heard from her since his incarceration.

Miles testified that MC had come into DHS custody in May 2020 and had been in twelve placements since that time. She said he was doing well in his current foster home,

which was a potential adoptive placement. She said MC was "the most resilient kid" she had ever met in the foster-care system, was very bright, was sensitive, socializes well with other kids, and is adoptable.

Miles testified that MC's trial placement with Workman ended because he expressed fear with Fisher being in the home. Miles said that she and MC had been performing a "social practice called the safety house" during which MC talked about people in his life that made him feel safe and happy. MC broke down crying when discussing Fisher. She said MC does not like to talk about Fisher in therapy but had recently discussed his fear of him. She said MC had also recently consoled another foster child who was afraid. MC told the child how to get through "scary moments" and used his mother protecting herself from Fisher with a high-heeled shoe as an example. Miles opined that she did not think MC could safely be placed with Workman because it was a "gray area" with Fisher, MC had named Fisher as a "not safe person," and MC does not trust Fisher. Miles recognized that Workman had been consistent with her employment, housing, and communication with DHS but opined that MC's fear of Fisher and his reluctance to discuss it in family therapy in front of Workman was a "gray area." She said the case was opened due to MC's fear of a caregiver in his home, and a trial placement with Workman was ended for the same reason.

Regarding Ludwig, Miles testified that she had spoken with his sister, Cassie Holt, and she had filled out the "450 form" and turned it in. She said that her supervision team did not act on the form because MC had experienced so many placements during his time

7

in foster care, and they wanted to make sure that MC's long-term goal was set in place to achieve permanency.

Bowles, MC's therapist, testified that she had been working with MC since October 2020. She said he had made substantial progress with being able to discuss things that were scary and stressful. She said she was also conducting the family-therapy sessions with MC and Workman and that MC had begun to talk more easily with Workman about his traumatic experience with his step-grandfather. She testified that MC still "completely shuts down," however, when discussing Fisher and that MC was "very guarded" when talking about things that happened when he lived with Workman. Bowles stated that for MC to be mentally healthy, he needed to feel safe with his caregivers and to be able to talk about things. She said that while alone in therapy, MC had described how Fisher had punched Workman and that Workman and MC had snuck out of the house and slept in Workman's car, an event Workman denied. After MC was told they would discuss the event in family therapy, MC was visibly distressed and unable to speak about it with Workman, turning his body away from her and hiding under a blanket. Bowles testified that MC misses his mother but is afraid that Fisher will be there if he goes back to her house. Bowles said MC told her that Fisher "is not a safe person." Bowles said she was with MC and Workman recently when MC, who was playing on Workman's phone, gave the phone to Workman and said Fisher had texted.

On September 6, the circuit court entered an order terminating Workman's parental rights on the grounds of failure to remedy and subsequent factors and Ludwig's parental

8

rights on the ground of failure to remedy. The court also found that termination was in MC's best interest. Both parents filed timely notices of appeal from the termination order. Ludwig also filed a motion for reconsideration on September 29, alleging that there was no need to terminate his parental rights because his sister had completed the paperwork to be considered for placement, and DHS had an obligation to attempt to place a juvenile with a family member. The court did not rule on Ludwig's motion, and he filed an amended notice of appeal on November 1 adding his motion for reconsideration to the list of documents in the record on appeal.

On appeal, we review termination-of-parental-rights cases de novo but will not reverse the circuit court's decision unless its findings are clearly erroneous. *Dade v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 443, at 1, 503 S.W.3d 96, 97. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* at 2, 503 S.W.3d at 97. In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. *Jackson v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 440, at 5, 503 S.W.3d 122, 126.

In termination-of-parental-rights matters, the circuit court is required to follow a two-step process by finding by clear and convincing evidence first that the parent is unfit and second that termination is in the best interest of the child. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 5, 555 S.W.3d 915, 918. The first step requires proof of one

or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the children's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). Finally, the intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). This need for permanency overrides a parent's request for additional time to improve circumstances, and courts will not enforce parental rights to the detriment of the well-being of the child. *McElwee v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 214, at 7, 489 S.W.3d 704, 708.

Workman contends that the grounds found by the circuit court are not supported by clear and convincing evidence. We first consider the court's finding that other factors arose subsequent to the filing of the original petition demonstrating that placement of MC in Workman's custody is contrary to his health, safety, or welfare, and despite the offer of appropriate family services, Workman has manifested the incapacity or indifference to remedy these factors. The court found that the subsequent factor was Workman's "ill-defined" relationship with Fisher and the threat he posed to MC.

Workman points out that Miles described her relationship with Fisher as "unclear" and a "gray area" and that the circuit court found that the relationship is "ill-defined." She claims that clear and convincing evidence, which is required to support grounds for

10

termination, is not evidence that is "gray" and "ill-defined." She argues that the court's own characterization of the evidence does not "chin the 'firm conviction' bar." We disagree.

Before the trial placement, the circuit court repeatedly expressed concern about MC's safety if placed with Workman because of her relationship with Fisher. The court's concern was whether Workman could protect MC and keep him safe from harm. Toward that end, Workman was ordered to involve Fisher in the case plan if she intended to have him in MC's life. The record shows that Fisher's involvement in the case was sporadic at best, and there is evidence that he refused DHS services.

During the trial placement, DHS learned that Workman allowed Fisher to be alone with MC in violation of the court's orders and the DHS safety plan. The court found that Workman had instructed MC to lie about Fisher's presence in the home and that telling the child to lie put him at great risk of further maltreatment. MC witnessed domestic violence between Workman and Fisher, and MC told Bowles that Fisher was "not a safe person." The court also took note of Bowles's testimony that MC was struggling to view Workman as a reliable caretaker who could keep him safe. Miles testified that MC was afraid of Fisher and that MC had recently consoled another foster child who was afraid, telling the child how to get through "scary moments" by describing how Workman protected herself from Fisher with a high-heeled shoe. Continuing in a relationship with a dangerous partner is sufficient evidence of factors arising subsequent to removal and can demonstrate a parent's incapacity or indifference. *Scroggins v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 16, at 9, 659 S.W.3d 305, 310–11 (citing *Martin v. Ark. Dep't of Hum. Servs.*, 2017 Ark. 115, at 12, 515 S.W.3d

599, 607 (affirming circuit court's subsequent-factors decision based on the father's inability to separate from his children's abuser)).

Workman also contends that her "undisputed" testimony at the termination hearing demonstrates that she is no longer in a relationship with Fisher. Although Workman testified that she and Fisher had ended their relationship about seven months prior, a month before the termination hearing, MC saw a text on Workman's phone from Fisher. Workman acknowledged this and testified that Fisher "still does message my phone" and that she is still in contact with him "[e]very now and then." Furthermore, the court was not required to believe Workman's testimony that she and Fisher were no longer in a relationship or that she would not allow Fisher to be around MC if MC were returned to her custody. The circuit court is in a far superior position to observe the parties before it and weigh the credibility of the witnesses. *Younger v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 138, at 6, 643 S.W.3d 487, 491. We will not act as a super fact-finder or second-guess the circuit court's credibility determination. *Robinson v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 208, at 9, 625 S.W.3d 388, 394. Finally, failure to comply with court orders can serve as a subsequent factor on which termination of parental rights can be based. *See Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 9, 555 S.W.3d 915, 920. Workman has never been in full compliance with the case plan and court orders as she failed to involve Fisher in the case plan, allowed Fisher to be alone with MC, and failed to demonstrate the ability to protect MC and keep him from harm.

For these reasons, we hold that the circuit court's finding of the subsequent-factors statutory ground is not clearly erroneous. Because we affirm on the court's finding of subsequent factors, it is unnecessary to address the evidence supporting the failure-to-remedy ground. Proof of only one statutory ground is sufficient to terminate parental rights. *Contreras v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 604, at 5, 474 S.W.3d 510, 514. We affirm the circuit court's order terminating Workman's parental rights to MC.[1]

We turn now to the termination of Ludwig's parental rights. Ludwig does not challenge the grounds supporting the circuit court's decision to terminate his parental rights. His sole point on appeal is that the court clearly erred in finding that termination of his parental rights was in MC's best interest. Specifically, Ludwig argues that termination was not in MC's best interest because there was a less restrictive alternative through placement with his sister, Cassie Holt. He claims that he provided Miles with Holt's name and contact information; Miles spoke with Holt; the forms for possible placement were filled out; and the DHS supervision team "paused" the paperwork due to its concern about the effect on MC of another placement. Citing the supreme court's decision in *Ellis v. Arkansas Department of Human Services*, 2016 Ark. 441, 505 S.W.3d 678, and this court's decision in *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, Ludwig argues that the statutory preference for placement of a child with a relative applies throughout the dependency-neglect case and should have applied at the termination hearing in this case.

---

[1]Workman does not challenge the circuit court's finding that termination of her parental rights is in MC's best interest.

13

We hold that the issue is not preserved for appellate review because it was not sufficiently raised below and because Ludwig did not obtain a ruling. In *Hile v. Arkansas Department of Human Services*, 2023 Ark. App. 173, the appellants challenged the circuit court's best-interest finding with respect to relative placement. This court did not reach the merits of the argument because it was not preserved for appeal.

In the case at bar, there was testimony at the termination hearing about DHS's contact with Ludwig's sister. However, Ludwig's counsel did not raise the relative-placement issue to the court. Indeed, the record of the termination hearing contains no discussion of this issue by anyone. We note that, at the conclusion of the court's oral ruling explaining its reasons for granting the petition for termination, the court asked if there was anything else from counsel that needed to be addressed. Ludwig's attorney did not respond. The court's order terminating the parties' parental rights does not mention relative placement or Ludwig's sister. The failure to raise a challenge or obtain a ruling from the circuit court is fatal to this court's consideration of the issue on appeal. *Hile*, 2023 Ark. App. 173, at 9.

While we recognize that Ludwig filed a motion for reconsideration attempting to raise the issue, the circuit court never ruled on the motion. And because the motion for reconsideration was not filed within ten days of the entry of the termination order, it was not subject to the deemed-denial provision set forth in Arkansas Rule of Appellate Procedure–Civil 4(b)(1) (2022). Without a ruling from the circuit court, this court has nothing to review. Accordingly, we affirm the court's order terminating Ludwig's parental rights without reaching the merits of his argument.

14

Affirmed.

BARRETT and THYER, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for separate appellant Cheyenne Workman.

*James & Streit*, by: *Jonathan R. Streit*, for separate appellant Jesse Ludwig.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.