Cite as 2019 Ark. App. 528

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-19-453

| | |
|---|---|
| MELISSA EVERLY<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered:** November 13, 2019<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FJV-17-13]<br><br>HONORABLE ANNIE HENDRICKS, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Chief Judge

Appellant Melissa Everly appeals an order of the Sebastian County Circuit Court terminating her parental rights to her child, BE. On appeal, she argues that termination of her parental rights was not in BE's best interest.[1] We affirm.

On January 4, 2017, the Arkansas Department of Human Services (DHS) took a seventy-two-hour hold on BE (DOB 11/05/06) based on allegations that Melissa failed to protect BE by allowing her boyfriend, Joseph Henry, into her home and around BE after BE made allegations of sexual contact. These allegations resulted in a "true finding" after an investigation by the Crimes Against Children Division (CACD) of the Arkansas State Police. The case progressed through probable-cause and adjudication hearings. The circuit court

---

[1]The parental rights of Greg Everly, BE's father, were also terminated pursuant to a voluntary termination. Greg is not a party to this appeal.

found BE was dependent-neglected, ordered continued custody in DHS, and set the goal of reunification, with a concurrent goal of permanent-relative custody. The court ordered that BE visit with Melissa only at the recommendation of BE's therapist. The parents were ordered to obtain/maintain stable and appropriate housing, employment, income, and transportation; complete parenting classes; stay clean and sober; submit to a psychological evaluation and complete any treatment recommended; and submit to random drug screens.

A review hearing was held on June 7, and the circuit court found that DHS had made reasonable efforts to provide or make available services to achieve the goal of reunification. The circuit court found that the parents had not complied with the case plan and had not had contact with DHS. While Melissa submitted to a drug-and-alcohol assessment, she had not completed treatment, and a psychological evaluation was scheduled for August 3. In addition to the orders previously set out in the adjudication order, Melissa was ordered to complete domestic-violence education. Melissa requested that her sister be considered as a placement option, and Greg asked that his mother be considered. The court continued the goal of reunification.

A permanency-planning order was filed February 1, 2018, with the circuit court setting concurrent goals of reunification, adoption, or permanent-relative custody. The order noted that although Melissa had competed a psychological evaluation, a drug and alcohol assessment, and parenting classes, Melissa remained unconvinced that Joseph Henry did anything inappropriate with BE despite the fact that Henry had pled guilty to a sex crime in which his daughter was the victim and there was evidence suggesting Melissa was still in a relationship with him. Melissa claimed she had not answered her door to allow the

caseworker to make unannounced visits because she worked from home; this was also her excuse for being unavailable for drug screens or to attend counseling or domestic-violence classes. The order provided that it had serious concerns that BE could be safely returned to Melissa within a time frame consistent with BE's developmental needs, noting that Melissa needed to "intensify her level of compliance." The order stated that BE was in a kinship-foster placement with her paternal grandparents, but the court did not have sufficient information to determine whether permanent-relative custody would be more appropriate than adoption if reunification was not achieved. The court found that DHS had made reasonable efforts to finalize a permanency plan. The parents were ordered not to have contact with BE except as specifically approved by DHS, and further that there be no contact between BE and Joseph Henry and that Melissa report any contact with him to DHS.

A fifteen-month review hearing took place on March 7, 2018. The court continued the concurrent goals of reunification, adoption, or permanent custody. In addition to including the previous orders from the permanency-planning hearing, the court further ordered Melissa to provide the caseworker a copy of her 2017 state and federal tax returns along with her paystubs.

On May 30, 2018, DHS filed a petition for termination of parental rights alleging numerous grounds: failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)*(i)(a)* (Supp. 2017)); failure to provide meaningful support (Ark. Code Ann. § 9-27-341(b)(3)(B)*(ii)(a)*);

3

abandonment (Ark. Code Ann. § 9-27-341(b)(3)(B)*(iv)*); and subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)*(vii)(a)*).[2]

The termination hearing was held on October 23. Four witnesses testified at the hearing: BE; Melissa; Dustin Barlow, DHS public-assistance investigator; and DHS caseworker Mindy Tuck-Duty.

At the time of the termination hearing BE was in the sixth grade. She testified that she went into foster care because her mom's boyfriend "did some really bad stuff" to her. Initially, BE lived with foster parents for three months, followed by several months with her aunt and uncle before being placed with her paternal grandparents, with whom she resided at the time of the hearing. BE testified that she had not visited her mom since she was removed from her home, nor did she want to see or talk to her. BE stated that she had participated in therapy with her mom but did not like it because she did not want to see her mom, her mom did not listen to her, and her mom lied in counseling.

BE prepared a written list to present to the circuit court outlining fifteen reasons she did not want to live with her mom, including in part that her mom always believed her boyfriend over BE; she saw a picture on Facebook that showed her mom partying two days after she was removed from the home; her mom would "pop" her mouth if her mom did not like what she said; her mom used her as a shield when her parents fought, which resulted in her getting punched once; her mom had attempted and threatened suicide; and her mom smoked "meth" out of a pipe. BE expressed a desire to be adopted by her paternal

---

[2]With respect to Greg, DHS also alleged the incarceration ground (Ark. Code Ann. § 9-27-341(b)(3)(B)*(viii)*).

grandparents, understood that it meant her mom's parental rights would be terminated, and did not want a final visit with her mom.

Melissa testified that she continued to live in the home from which BE was removed. At the time of the October termination hearing, Robert Crossno was living with her and paying her bills because she had filed for disability. She explained that she began talking to Crossno in July 2018, first met him in person in mid-August, and allowed him to move in with her in early September. She admitted smoking marijuana with Crossno and that she had been testing positive for THC since the beginning of the case. At another point during the case, Melissa testified that her cousin, Joseph Turnbough, was living with her and paying her bills. Melissa acknowledged that when caseworker Mindy Tuck-Duty came to her home in April 2017, both she and Turnbough tested positive for drugs.

Melissa said that she worked from home for Hilton Hotels and that she earned money from odd jobs. She admitted that after BE had been removed, she claimed BE on her tax return and listed BE on her food-stamp and HUD applications. Melissa testified that she received a tax refund, which she used to fix her car and buy things for BE for when she returned home.

Melissa testified that she wanted BE back. She explained that she was diagnosed with PTSD, agoraphobia with panic attacks, borderline personality disorder, and major depressive disorder. She had been taking Zoloft and clonazepam regularly since August. When asked why she was still smoking marijuana when she was trying to get her daughter back, she stated that she was trying to keep herself stable. At the time of the hearing, she said her medicines were working and that she had not smoked marijuana in "a week or two . . .

tops." Melissa claimed that there were plenty of negative drug tests, as she only used marijuana to control her anxiety. Melissa thought she was mentally and financially stable. She attributed her financial stability to Crossno, who was going to support them because they were a couple and planning a future together.

About the suicide attempts mentioned by BE, Melissa stated that none involved knives because she "always used pills." Melissa claimed that her 2014 involuntary commitment was not the result of a drug overdose but an asthma attack. She could not recall that she was found unresponsive next to an empty bottle of clonazepam and given Narcan by EMTs, or that she sent texts to a friend indicating she was going to commit suicide.

Melissa testified that she had not been in contact with Joseph Henry since they split up shortly after BE was removed from the home. In Melissa's psychological evaluation, she revealed that she had been sexually abused in her home for years by her oldest half brother and that her family did not believe her. She had two family therapy sessions with BE, although she wanted more. Melissa testified that she felt the atmosphere with BE's placement was "toxic" because Greg's parents always blamed her for his drug and anger problems and his violence toward her.

Mindy Tuck-Duty, the family service worker assigned to the case, had been involved since the case began in January 2017. She testified that she had difficulties obtaining access to Melissa's home to determine if it was appropriate, explaining that Melissa would not be there or would not answer the door. During an April 2017 visit, Mindy observed a cloud of smoke when Joseph Turnbough answered the door, but Melissa was not home. When

Melissa arrived, she and Turnbough submitted to drug tests that showed Melissa positive for THC and Turnbough was positive for methamphetamine and THC. Prior to the visit, Melissa had not informed Mindy that Turnbough was living in the home, but then indicated he is a cousin and helping her financially maintain her home. Mindy also had difficulty obtaining other information from Melissa, such as her tax returns and employment or income information. Mindy testified that Melissa was required to have a reliable means of transportation. Mindy learned that when Melissa's car broke down, she used Joseph Henry's truck. In addition, Mindy saw Melissa's car at Henry's home on several occasions, including one occasion in September 2018 where they were outside his home. Mindy testified that Melissa had one clean screening taken at court and all the rest were positive for THC.

When Melissa reached out to her saying she had not been contacted about counseling, Mindy called the therapist, who reported that they had trouble reaching Melissa. Mindy explained there were two sessions with BE, but they were not productive because of Melissa's inability to accept responsibility.

Mindy did not believe that Melissa was rehabilitated, pointing to her dependence on marijuana to control her anxiety. Mindy testified that Melissa was in worse condition than when the case began because she was completely dependent on others and had not been able to maintain a stable job or support herself, indicating that she was moving individuals into the home to help her keep the apartment and pay utilities. She was concerned about Melissa's ability to care even for herself, much less an eleven-year-old child. Mindy was not aware of any more services that could be provided to achieve reunification within a time frame consistent with BE's developmental needs.

Mindy stated that BE is adoptable and is living with a family that can adopt her. She said BE is a "sharp kid" and "very personable." Mindy recommended termination of parental rights even if BE was not going to be adopted. Mindy thought BE would be at risk of harm if she were returned to Melissa due to her mental and financial instability, unrealistic expectations of her relationship with BE, and Melissa's overall judgment. Mindy testified that Melissa never believed BE was telling the truth about the allegations concerning Joseph Henry. Instead, Melissa thought BE was a "very sexualized child" and Henry did not make those advances. Mindy did not feel as though Melissa had learned anything in the past twenty-one months that would enable her to do a better job protecting her child. Mindy did not think BE should have a final visit with Melissa, stating it would be too traumatic.

Dustin Barlow, a public-assistance investigator for DHS, testified that he reviews income information provided by individuals who seek benefits from DHS. He testified to many inconsistencies in Melissa's HUD and food-stamp applications. Although BE had been removed from her home, BE was listed as a member of Melissa's household, which allowed her to keep the two-bedroom apartment and have significantly reduced rent. Barlow said that Melissa did not list Crossno as being in the home in her October 1, 2018 HUD papers, but did list him on her October 8 food-stamp application.

The attorney ad litem recommended termination, agreeing with Mindy that Melissa was in worse shape at the time of the termination hearing than she had been when the case began because she was totally dependent on others for her entire living. The CASA report also recommended termination.

Upon conclusion of the hearing, the court terminated parental rights on three grounds—failure to remedy, failure to provide significant support, and subsequent factors. The court found the testimony of Mindy Tuck-Duty, Dustin Barlow, and BE to be credible and the testimony of Melissa not to be credible.

The court found that in addition to grounds, it was in the best interest of BE to terminate parental rights. Melissa filed a timely notice of appeal from the March 1, 2019 termination order.

We review termination-of-parental-rights cases de novo. *Roland v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 333, 552 S.W.3d 443. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3)(A),(B). In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Ware v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 480, at 6–7, 503 S.W.3d 874, 878. The potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 11, 379 S.W.3d 703, 709. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the "best interest" finding that must be supported by clear and convincing evidence. *Singleton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 455, at 5, 468 S.W.3d 809, 812.

We will not reverse a termination order unless the circuit court's findings are clearly erroneous. *Fisher v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 39, at 4, 569 S.W.3d 886, 888. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Credibility determinations are left to the fact-finder. *Kerr v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 271, at 6, 493 S.W.3d 342, 346.

On appeal, Melissa does not challenge the statutory grounds and instead limits her argument to the best-interest determination. But even within her best-interest argument, Melissa does not address the findings associated with adoptability or potential harm. Rather, she argues that (1) permanent custody with relatives as opposed to termination of her parental rights was the least restrictive alternative and in BE's best interest, and (2) termination was not in BE's best interest because it severed the relationship between her and her half siblings. Because she has not challenged the court's decision as to the grounds for termination, adoptability, or potential harm, we need not address them on appeal. *Fisher*, 2019 Ark. App. 39, at 4, 569 S.W.3d at 888.

The termination order included the following best-interest findings:

> 7. The Court finds by clear and convincing evidence that it is in the best interest of the juvenile to terminate parental rights. In making this finding, the court specifically considered: (A) the likelihood that the juvenile will be adopted if the termination petition is granted; and (B) the potential harm on the health and safety of the juvenile caused by returning the juvenile to the custody of either parent. The juvenile is a delightful, intelligent, almost-twelve (12) year-old girl who has no significant medical, behavioral, or psychological issues. She is stable in a placement with paternal grandparents who wish to adopt her. If for any reason her grandparents were unable to adopt her, she would still be adoptable. However, the court finds that, regardless of adoptability, it is in the best interest of [BE] for the parental rights of both parents to be terminated. Her father has an extensive history of criminal activity, incarceration, and failure to safely and appropriately parent [BE]. The

mother poses as great a risk of harm to the juvenile as she did when the Department exercised its 72-hour hold twenty-one (21) months ago. The juvenile would be at risk of harm psychologically and physically if returned to her mother's care, or if the mother is allowed to maintain contact of any kind.

First, Melissa contends that evidence does not support the circuit court's best-interest determination because permanent-relative custody was a less restrictive alternative available to the circuit court that would have achieved permanency for BE without employing the extreme measure of termination of parental rights. This court recently addressed a similar argument in *Phillips v. Arkansas Department of Human Services*, 2019 Ark. App. 383, 585 S.W.3d 703. *Phillips* was a two-parent termination where the children remained in DHS custody and were placed with their grandparents. In the mother's appeal, she raised a limited argument that termination of her parental rights was not in the children's best interest because the children were living with their grandparents. We affirmed, holding that based on mother's incapacity to remedy the issues that arose subsequent to removal—the evidence of which was not challenged on appeal—it was not a case in which the circuit court should have adopted less-restrictive alternatives than termination. In its analysis, this court distinguished several cases in which termination orders were reversed because termination was not in the children's best interest given the less-restrictive alternative of relative placement, including *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851, and *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102.

In *Cranford*, the child was in the permanent custody of a relative and not in a temporary foster-care placement with a relative. In reversing, this court held that there was "little harm in affording both [parents] more time to pursue reunification . . . and such

11

efforts come with a potential benefit to the child." *Cranford*, 2011 Ark. App. 211, at 11–12*,* 378 S.W.3d at 857. *Caldwell*, which is cited by Melissa, was a one-parent termination case in which the child was in the permanent care of the mother, and therefore termination of the father's rights would not achieve permanency. In addition, preservation of the child's relationship with her paternal grandmother weighed against termination because the trial court found the relationship to be one of the most stable influences in the child's life.

In contrast to *Cranford*, BE remained in DHS custody through the entire case and was in a temporary foster-care placement with her grandparents. Likewise, this was not a one-parent termination case as in *Caldwell*. Here, the circuit court specifically found that Melissa posed as great a risk of harm at termination as she did when BE was initially removed, and BE would be at risk of harm psychologically and physically if returned to Melissa or if she was allowed to maintain contact of any kind. Melissa had not made progress toward stability. By her own admission, Melissa was depending on a man for financial support whom she had moved into her home two months before the termination hearing after knowing him only a short time. Melissa recognized her psychological diagnoses and stated that her medications were working but admitted it had only been a week or two since she last smoked marijuana. She claimed she used marijuana only to control her anxiety and keep her stable. Like *Phillips*, *supra*, this was not a case in which the circuit court should have adopted less restrictive alternatives than termination.

Melissa further argues that the circuit court's best-interest analysis was incomplete because it failed to consider how termination would affect the relationship between BE and her half siblings. She contends that a consideration of this factor weighs in favor of finding

that termination was not in BE's best interest. In support of her argument, she cites *Clark v. Arkansas Department of Human Services*, 2016 Ark. App. 286, 493 S.W.3d 782, and *Caldwell, supra. Clark* is inapplicable because it was a change-of-custody case.

Keeping siblings together is an important consideration but is not outcome determinative, as the best interest of each child is the polestar consideration. *Allen-Grace v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 286, at 9, 577 S.W.3d 397, 402. While the impact a termination decision has on a child's relationship with a relative may be a relevant consideration within the best-interest analysis, there was no evidence introduced or argument made to the circuit court regarding the relationship or bond between BE and her older half siblings. Melissa testified that her two children from a previous marriage lived with their father. Although Melissa testified that she still communicated with her children, there was no evidence of BE's relationship with them. Much more evidence of a genuine sibling bond is required to reverse a best-interest finding based on the severance of a sibling relationship. *Brown v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 370, at 11, 584 S.W.3d 276, 283 (affirming best-interest determination where there was little to no evidence of a genuine relationship between twins and their baby sister who was born while they were in foster care and whom they had seen only once during a visit with their mother); *see also Rice v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 141, at 8–9, 572 S.W.3d 907, 912 (holding that the circuit court's failure to make a finding on the effect of termination on the familial relationship with a sibling when there was no court order in place allowing for visitation of the siblings was not reversible error).

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). At the time of the termination hearing, BE had been in foster care for over twenty-one months. Both the caseworker and the attorney ad litem opined that Melissa was in worse condition at the time of the termination hearing than when the case began. Likewise, the circuit court found that Melissa posed as great a risk of harm as she did when the case began. Not only did the circuit court find that BE would be at risk of harm if returned to Melissa, it found that BE would be subject to such harm if Melissa was even allowed to maintain contact of any kind. After a de novo review, we are not left with a definite and firm conviction that a mistake has been made.

Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.