Cite as 2023 Ark. App. 514

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-23-307

AYISHA FREEDMAN
                              APPELLANT


V.



ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILDREN

                              APPELLEES

Opinion Delivered November 8, 2023

APPEAL FROM THE LONOKE
COUNTY CIRCUIT COURT
[NO. 43JV-20-45]


HONORABLE BARBARA ELMORE,
JUDGE


AFFIRMED

---

## STEPHANIE POTTER BARRETT, Judge

Ayisha Freedman appeals the Lonoke County Circuit Court's order terminating her parental rights to her children: son MC1 (dob 03-31-08), daughter MC2 (dob 10-02-15), daughter MC3 (dob 02-26-17), and son MC4 (dob 03-13-18).[1] On appeal, Freedman argues that the circuit court erred in terminating her parental rights because the evidence was insufficient regarding any of the grounds alleged and because it was not in her children's best interest. We affirm.

DHS filed a petition for ex parte emergency custody and dependency-neglect on March 11, 2020, after MC1 presented at the Lonoke Police Department on the night of

---

[1]There were no paternal parental rights established in this case.

March 9 alleging Freedman had hit him with a belt because he had failed to clean his room to her standards. The family-service worker found Freedman to be violent toward the children and her explanation for MC1's injury unconvincing; she had immediate concern for the children's safety; and there had been three prior true cases all involving Garrett's Law issues. The order of emergency custody was granted the same day.

A probable-cause hearing was held on March 13. The circuit court found the emergency conditions necessitating the children's removal continued, and it was contrary to their welfare to be returned home. The circuit court ordered two hours of DHS-supervised visitation twice a week for Freedman. DHS was ordered to develop an appropriate case plan for the family. Freedman was ordered to attend parenting classes and individual counseling; submit to random drug screens; remain drug-free; submit to a drug-and-alcohol assessment and follow any recommendations; maintain stable housing and income; undergo a forensic psychological evaluation; comply with the case plan and cooperate and maintain contact with DHS; attend visitations; and demonstrate improved parenting.

An adjudication hearing was held on May 21; the parties stipulated that the children were dependent-neglected due to physical abuse. The circuit court also noted the prior true findings against Freedman for Garrett's Law issues and parental unfitness due to drug use. Custody of the children remained with DHS with the goal of the case being reunification. Freedman was granted unsupervised visitation with the children from 2:00 p.m. on Wednesdays until 6:00 p.m. on Fridays. DHS was ordered to make a referral for family-reintegration therapy, and Freedman was ordered to attend AA/NA meetings three times a

week as well as RCA aftercare.  MC1 and MC2 were ordered to attend counseling, and DHS was ordered to perform random home visits while the children were in Freedman's care. Freedman was ordered to refrain from using corporal punishment on the children.

A review hearing was held on October 13.  The circuit court found that it was in the best interest of the children for them to remain in DHS custody; the goal of the case remained reunification with a concurrent plan of permanent custody.  The circuit court found that DHS was providing all necessary services to achieve the goal of reunification, including foster care, referrals for therapeutic services, counseling, medical services, transportation, PACE evaluations, parenting classes, random drug screens, worker visits, supervised visitation, drug-and-alcohol assessment, drug treatment, and psychological evaluation.  Trial placement of the children with Freedman was ordered to begin as soon as she found a child-care facility.  DHS was ordered to make a referral for intensive family services (IFS) once the children began the trial placement.  Freedman was ordered to refrain from using corporal punishment on the children and to continue family-integration therapy with MC1.

Another review hearing was held December 2.  The circuit court continued custody of the children with DHS; the goal of the case continued to be reunification with a concurrent goal of adoption.  The trial placement, which had begun November 13, was continued.  The circuit court found that DHS had made reasonable efforts to provide services to achieve reunification.

On March 17, 2021, the attorney ad litem filed a motion to terminate the trial placement, alleging Freedman's home had been searched by her probation officer on March 16, and Tristan Hunter, a felon with a history of child abuse who was currently involved in another open DHS case, was found to have been residing in the home for the past month. Freedman admitted she had left the children alone with Hunter, the alleged biological father of Freedman's three youngest children, while she worked. Bags containing methamphetamine residue and drug paraphernalia were found in the house within reach of the children. Hunter claimed the drug paraphernalia belonged to him, and he admitted to his parole officer that he would test positive for methamphetamine. Firearms and brass knuckles were also found in the house, and it was cluttered, infested with roaches, and contained safety hazards. The children reported—and Freedman admitted—that they were being evicted from the house. Although Freedman tested negative for illegal drugs, the ad litem alleged she had placed her children in danger by allowing a violent offender to live in the home and take care of the children while she worked. The circuit court granted the ad litem's motion to terminate the trial placement, finding it was contrary to the children's welfare and best interest to remain in Freedman's physical custody.

A permanency-planning hearing was held on March 31. Although the circuit court found it was in the children's best interest for custody to continue with DHS, it nonetheless determined that the goal of the case would be authorizing a plan to place custody with a parent, guardian, or custodian. The circuit court determined the children should be placed in Freedman's home within a time frame consistent with their developmental needs but no

4

more than three months from the date of the permanency-planning hearing. The circuit court ordered DHS to arrange for the children to have hair-follicle drug tests. Freedman was also ordered to participate in homemaker services; DHS parenting classes; PhD level individual counseling; family counseling; random drug screens; to remain drug free; to maintain stable housing and income; to undergo a new forensic psychological examination; to comply with the terms of the case plan, cooperate, and maintain contact with DHS; to attend visitations; and to demonstrate improved parenting.

On October 22, the attorney ad litem filed another motion to suspend visitation alleging that, although Freedman had represented to the circuit court that she no longer had contact with Hunter, an Arkansas Department of Correction list of phone calls indicated that Hunter had been calling Freedman on Sundays from July 4 to October 10, 2021. The ad litem argued that Freedman could not be trusted to keep her children safe or follow court orders. The circuit court suspended unsupervised visitation and reinstated two-hour supervised visitation twice a week.

A review hearing was held on January 19, 2022. The circuit court found it was in the children's best interest to remain in DHS custody with the goal to remain reunification; it further found DHS had made reasonable efforts to provide services to achieve the goals of the case. Freedman was ordered to cooperate with DHS and follow the case plan; to refrain from using or possessing controlled substances and to submit to drug screens; and to submit to hair-follicle testing at DHS's request.

A permanency-planning hearing was held on March 9. The circuit court continued custody of the children with DHS, but the goal of the case remained custody with a parent, guardian, or custodian. The circuit court found Freedman partially compliant with the case plan and ordered her to attend in person AA/NA meetings at least two times a week. DHS was found to have made reasonable efforts to finalize a permanency plan and was ordered to perform background checks on any caregivers or roommates Freedman had; to perform random drug-and-alcohol screens at least twice a month; to refer Freedman for budgeting assistance; and to supervise Freedman's visitations with the children.

A review hearing was held on June 14. Custody of the children remained with DHS, and the goal remained reunification with a concurrent goal of permanent custody with a relative. DHS was found to have made reasonable efforts to provide services to achieve the goals of the case. Freedman's supervised visitation was changed to one supervised visitation a week with the other weekly visit supervised for the first thirty minutes but unsupervised for the last ninety minutes. The circuit court also ordered that the children were to have no contact with Hunter, and no corporal punishment was to be used on them.

On August 22, DHS program assistant Mary Ousley filed documentation with the circuit court regarding her August 17 interaction with Freedman, stating that she told Freedman that the children had told her that someone named "Lisa" had been at the house when they last visited, and Freedman had told Ousley she did not know why the children said that because Lisa had come to the house but she had told Lisa that she could not be there during visitation because she would get in trouble. Ousley left Freedman's house after

6

the interaction, but before she returned, she received a call from the CASA worker telling her that Lisa was at the house. When Ousley returned to Freedman's house and asked to check the house, Ousley found Lisa in the bathroom.

The ad litem filed a motion on August 22 to suspend Freedman's visitation again, basing her request on the fact that Lisa was present during visitation, even though Freedman had been instructed by the circuit court not to have anyone without an approved background check around the children, and that Freedman had told the children not to tell anyone because she would get in trouble, although she denied that when questioned by Ousley. The ad litem requested that visitation again be supervised because Freedman could not be trusted to keep the children safe during unsupervised visitation; the circuit court entered an order granting this request.

A review hearing was held on October 25, at which the circuit court changed the goal of the case from reunification to adoption; that order was not filed until January 11, 2023. On November 30, the ad litem filed a petition to terminate Freedman's parental rights alleging the following grounds: (1) the children had been adjudicated dependent-neglected and had continued out of Freedman's custody for twelve months, and despite a meaningful effort by DHS to rehabilitate Freedman and correct the conditions that caused removal, the conditions had not been remedied; (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrated placement of the children in Freedman's custody was contrary to their health, safety, or welfare and that despite the offer of appropriate family services, Freedman had manifested the incapacity or indifference

7

to remedy the subsequent issues or factors or rehabilitate the circumstances that prevented placement of the children with her; and (3) Freedman had subjected the children to aggravated circumstances because there was little likelihood that continued services would result in successful reunification. The petition further alleged that termination of Freedman's parental rights was in the children's best interest.

At the termination hearing, Nicole Boyd testified that she had been the family-service worker for the Freedman case since October 6, 2022. She recounted the services DHS had provided to Freedman as well as the 2021 trial home placement that was terminated after Freedman had been untruthful about her contact with Hunter, drugs had been found in the house, and both Freedman and Hunter had been arrested. Boyd said that when the children returned to foster care, Freedman was required to start her services again, including another hair-follicle test, another psych evaluation, random drug screens, counseling, and AA/NA meetings. She said that while Freedman was attending counseling, she had not taken the court-ordered hair-follicle test. Boyd testified that Freedman's two-bedroom, one-bathroom house was not large enough for four children and that Freedman had canceled six visits with her children. Boyd said she had attempted to perform home visits at times when Freedman was not working, but Freedman was never home; Boyd admitted on cross-examination that she did not leave a notification to let Freedman know that she had attempted a home visit nor had she attempted to reach Freedman by phone. Boyd testified that Freedman's home was clean when she had visited in December. Boyd testified that Freedman told her that she did not agree with the DHS-required background check because Lisa worked with her

8

cleaning houses and was not part of the case; Boyd said she explained to Freedman that anyone who would be around the children needed a background check to ensure the children would be safe, and she did not have a background check on Lisa. Boyd testified that there were no additional services that could be offered to Freedman that had not already been offered; while Freedman had made some progress, the case had been ongoing for three years, and she did not believe reunification could occur in an appropriate time frame for the children. Boyd believed the children would be at risk if they were returned to Freedman because of Freedman's continued demonstrated poor judgment, and she recommended termination of Freedman's parental rights because the children need stability, which Freedman had failed to provide. Boyd testified that all four children are adoptable.

CASA volunteer Miekka Maile testified that she had been assigned to the case since March 2021; her biggest concern was the length of the case and the lack of progress toward the children returning home. Maile testified that visits had become more inconsistent the longer the case continued and that Freedman usually made only one visit a week instead of the two she was allowed. She said that while Freedman appeared to be making progress, when she dug deeper for proof, not only could she not find evidence of progress, sometimes there was evidence contrary to what Freedman was telling her. Maile testified that she was aware of at least two occasions when people who were not supposed to be present during visitation were, in fact, present and that Freedman had exhibited poor judgment when she allowed Hunter to be around her children. Maile was concerned with Freedman's lack of judgment and her dishonesty; while she felt Freedman could be incredibly honest when she

9

was caught in a lie, she would believably lie until she was caught, which made Maile question everything Freedman told her. Maile stated that she did not believe there were any other services that could be offered to Freedman that had not already been offered to her that would result in a successful reunification; she did not believe Freedman thought she had a problem. Maile recommended termination of parental rights because she felt there was no forward progress. She believed termination was in the children's best interest because she did not see them returning home in the foreseeable future, and they need permanency; she also testified that she believes the children are adoptable.

Mary Ousley testified that she had worked with Freedman since April 2021 after the children had returned from trial placement with Freedman, and she mainly provided visitation supervision, one-on-one parenting instruction, and drug screens for Freedman. She said that the visits had been both good and bad; while Freedman interacted well with the children, she had canceled six of the last eighteen visits since the last court hearing. Ousley said some of the cancellations were due to Freedman's work schedule and a broken-down vehicle, but she had to end one visitation early because Freedman could not control the children, and she could tell that the children were getting on Freedman's nerves. Ousley said that one of Freedman's drug screens in June 2022 was positive for THC; Freedman blamed the positive test on the fact that she was cleaning a house where the owners were smoking weed. Freedman had tested negative since that time. Ousley testified about the children telling her that Lisa had been at the house and Freedman denying it, but when she checked the house, she found Lisa hiding in one of the rooms. Ousley also recounted the

time Freedman, against Ousley's recommendation, challenged MC1 to eat a spicy chip without drinking any water, promising to pay him sixty dollars. The challenge made MC1 sick; Freedman laughed at MC1 and only gave him a dollar. Ousley testified that Freedman continued to display poor parenting skills despite having ongoing parenting instruction; while she had benefited some from the parenting classes, she was unable to consistently make good parenting choices. Ousley was concerned with Freedman's poor judgment because when she did not make correct decisions, it placed her children in jeopardy, and it had cost Freedman her unsupervised visitation with her children. Ousley did not believe Freedman would be awarded unsupervised visits at any time in the near future; each time she had been given unsupervised visits, the visits had reverted back to supervised visits because Freedman could not follow court orders.

Bridgett Rappold, the Lonoke County supervisor for the Department of Children and Family Services, testified that Freedman had been provided intensive family services and integration counseling; family therapy; parenting classes; a psychological evaluation; and a drug-and-alcohol assessment. She explained that hair-follicle tests were ordered for the children, and two of the four tested positive for methamphetamine. Rappold said Freedman had completed services twice during this case and at least once during a previous foster-care case. Rappold said she was concerned because the two youngest children had been in foster care longer than they had been with Freedman; the children could still not be safely returned to Freedman's custody; and she did not believe Freedman had benefited from the services provided to her because she continued to make the same mistakes over and over. She stated

11

that while Freedman had always had a job, there were periods of time when she was unable to financially provide a stable home for the children. Rappold testified there were no other services that could be offered to Freedman to aid in reunification, and she did not believe allowing additional time would result in successful reunification but would just prolong the inevitable.

Freedman testified that her three younger children had all tested positive for THC at birth, and DHS was involved all three times; in 2018, DHS exercised a hold on the children, but they were returned to her custody in March 2019 and remained with her until March 2020 when the present case was opened. Freedman explained that she was on probation for possession of methamphetamine found in her vehicle, which she later learned belonged to Tristan Hunter. Freedman denied that she and Hunter were still involved or still in contact. Freedman explained that she had missed some visitation with the children due to her work schedule, the loss of her vehicle, and her being sick. Freedman admitted that she had laughed at MC1 after he did the "chip challenge." Freedman stated that she had done family therapy with her children for several months, and she acknowledged that intensive family services were performed over the telephone due to COVID 19 restrictions. Freedman admitted that she had not asked DHS for additional services, and she agreed that she had participated in all of the services three times, claiming that she had benefited from the services and was ready for the children to come home. However, on cross-examination, Freedman testified that she thought DHS should have provided family therapy because she could not fix what she did not know; she thought DHS was not telling her what was going

on with her children.  However, Freedman admitted that she had not called DHS to find out information about her children, and she testified that she did not expect the circuit court to find her credible because she had lied before.  Freedman admitted Hunter is not a good person to have around the children.

At the close of the hearing, in regard to the children's best interests, the circuit court found that three years in foster care was too long for the children and that some of the children's behavior was deteriorating because they had been in care for so long.  The circuit court noted that while there had been several different caseworkers assigned to this case, Freedman had been referred for services, and she had received the services, but she had not learned from the services she had received.  The circuit court noted that Freedman had received intensive family services, although they had to be performed over the phone due to COVID-19.  The circuit court stated that it did not find Freedman's testimony credible and that Freedman had shown poor judgment time and time again when it came to the children. The circuit court found Freedman's period of homelessness indicated a lack of stability in housing; that Hunter had brought drugs into her home and then was sent to prison as a result of his actions; and that two of her children had tested positive for drugs after that. The circuit court found Freedman had not changed; that she picked and chose what orders she wanted to follow; and that no amount of services would be sufficient if Freedman did not internalize them, which she had never done.  The circuit court stated it could not sleep at night if it returned the children to Freedman and terminated Freedman's parental rights

13

on all three bases alleged in the petition. The court further found that all the children are adoptable.

## I. *Standard of Review*

We review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Jennings v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 429, 636 S.W.3d 119. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the circuit court's opportunity to judge the credibility of the witnesses. *Id.*

Termination of parental rights is a two-step process that requires the circuit court to find at least one statutory ground for termination and to find that termination is in the juvenile's best interest. *Bobbitt v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 355. Both the statutory ground and the best-interest finding must be proved by clear and convincing evidence. *Everly v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 528, 589 S.W.3d 425.

## II. *Discussion*

The circuit court found three statutory grounds for termination—"twelve month/failure to remedy," "subsequent factors," and "aggravated circumstances." Freedman argues that DHS failed to prove any of the statutory grounds alleged. Proof of only one statutory ground is sufficient to terminate parental rights. *Barris v. Ark. Dep't of Hum. Servs.*,

2017 Ark. App. 380. We will focus on aggravated circumstances, and because the evidence is sufficient to prove that ground, there is no need to discuss the other two grounds.

"Aggravated circumstances" exist when "a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification[.]" Ark. Code Ann. § 9-27-303(6)(A) (Supp. 2021). Progress toward, or even completion of, the case plan is not a bar to termination of parental rights. *Edgar v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 312, 522 S.W.3d 127. What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for her child; mere compliance with the directives of the court and DHS is not sufficient if the root cause of the problem was not adequately addressed. *Id.*

In the present case, Freedman had been offered all the services available to her multiple times. Yet she continued to make poor decisions that placed her children in harm's way again and again. She allowed her children to be around people like Tristan Hunter, who brought drugs into her house, causing her two youngest children to test positive for methamphetamines after a hair-follicle test. Freedman had not taken another hair-follicle test herself, even though she had been court-ordered to do so. The circuit court found that even though Freedman had undertaken all the services DHS had to offer multiple times, she still had failed to internalize the lessons from those services. Freedman is asking this court to reweigh the evidence in her favor and to reach a result contrary to that of the circuit court; however, a circuit court does not commit reversible error by weighing the evidence differently than how appellant asks the evidence to be weighed. *Schultz v. Ark. Dep't of Hum. Servs.*, 2022

15

Ark. App. 175, 643 S.W.3d 856.  Having reviewed the testimony and evidence presented, we are not left with a definite and firm conviction that the circuit court clearly erred in finding DHS had proved the "aggravated circumstances" ground in this case.

Freedman also challenges the circuit court's finding that it was in her children's best interest to terminate her parental rights.  In making a "best interest" determination, a circuit court is required to consider two factors: (1) the likelihood the child will be adopted and (2) the potential harm to the child if custody is returned to the parent.  *Everly*, *supra*.  The potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence.  *Id.*  The potential-harm analysis is to be conducted in broad terms.  *Id.*

Freedman does not argue that her children are not adoptable. However, she argues that DHS failed to prove her children would be subject to potential harm if returned to her custody. The circuit court was not required to find that actual harm would occur if the children were returned to her, nor was it required to affirmatively identify a potential harm. *Jennings*, *supra*.  Evidence regarding potential harm must be viewed in a forward-looking manner and in broad terms; a parent's past behavior is often a good indicator of future behavior.  *Id.* Giving due deference to the circuit court's credibility determinations, the determination that termination of Freedman's parental rights was in the children's best interest was not clearly erroneous.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

16

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.