Cite as 2025 Ark. App. 580

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-25-428

| | | |
|---|---|---|
| RACHEL CAMACHO | | **Opinion Delivered** December 3, 2025 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04JV-23-456 ] |
| V. | | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE THOMAS SMITH, JUDGE |
| | APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Appellant Rachel Camacho ("Rachel") appeals the April 21, 2025 order of the Benton County Circuit Court terminating her parental rights to the youngest five of her nine minor children, MC1 (born 08/24/16), MC2 (born 12/09/17), MC3 (born 10/08/19), MC4 (born 11/16/20), and MC5 (born 11/03/21).[1] On appeal, Rachel argues (1) the circuit court's label of instability is inextricably tied to poverty, which is not a legally supportable basis for termination; and (2) the best-interest analysis failed to properly account for the statutory protections regarding sibling relationships. We affirm.

---

[1]During the pendency of this case, Rachel gave birth to another child. This child was never added as a party, so while Rachel has ten children, this appeal addresses the first nine children.

## I. *Facts and Procedural History*

On April 28, 2023, the Arkansas Department of Human Services ("the Department") received notice that Rachel's children were unclean, many of the children had sores on their heads from lice, and the children reported no running water and mice in the home. The Department went to Rachel's home that same day and provided four lice kits as well as assistance with an application for SNAP benefits. On May 5, 2023, Rachel informed the Department she had to move in with her sister but did not provide an address. On May 11, the Department had trouble reaching Rachel by phone, and the family service worker assigned to the case went to the children's school. Upon her arrival, she discovered the children still had sores from the head lice and learned Rachel's sister had asked her to leave because there was not enough room for all the children. Rachel explained to the family service worker that she did not have a plan for where she and the children would live, she had no plan to take care of the children's head lice other than to dye their hair, and she had taken a second job in the evenings but had no one to care for the children while she was working. During this conversation, the family service worker noticed one of the youngest children was dirty with brown grime running down her legs and her face, and she smelled of urine and feces. The Department contacted multiple motels for the family with no success, so Rachel's family took in the children while Rachel continued to seek housing.

On May 15, 2023, the Department had a meeting with Rachel and the children's school to go over the services that had been offered to Rachel, including therapy for Rachel, which she declined. Rachel told the Department she had been looking for apartments but

could not provide any applications. Rachel asked the Department to pay for a place for her and the children to live, and the family service worker informed Rachel the Department had provided rental assistance to her in the past and stressed she needed to stay within her monthly budget. Multiple people within the Department attempted to discuss budgeting with Rachel but had issues with her lack of flexibility and refusal to provide full information. While the children were staying with family, there were allegations that the children were overly tired and had disclosed that they weren't eating, the adults weren't consistently present in the home, and the teenagers were not consistently present to provide supervision. The Department offered Rachel daycare vouchers, and she said she would enroll the children. However, the Department later learned Rachel never completed the paperwork.

On May 19, 2023, the children were removed from Rachel's custody due to health and safety concerns based on her inability to meet the children's essential needs. The Department was unsuccessful in its efforts to help Rachel obtain stable housing, a childcare plan, and a reliable transportation plan to ensure the children were supervised and transported to and from school. On May 22, the Department filed a petition for ex parte emergency custody and dependency-neglect of the minor children, and on the same day, the circuit court entered an ex parte order for emergency custody. On May 23, the circuit court held a probable-cause hearing and found probable cause existed for the emergency order to remain in place. The court found the Department had made reasonable efforts to prevent removal of the minor children and ordered Rachel to participate in individual counseling, parenting classes, and homemaker services as well as to provide family member contact

3

information. Rachel was also ordered to submit to a head lice check, and the Department was authorized to cut the children's hair to address the lice problem.

On June 27, 2023, the circuit court held an adjudication hearing and made a dependency-neglect finding based on parental unfitness. The court also ordered that the case goal be reunification. Additionally, the court ordered Rachel to complete the requirements set out in the case plan. Specifically, the case plan required Rachel to allow the Department and CASA access to her home; to complete parenting classes and demonstrate the skills learned; to visit with the minor children regularly; to obtain and maintain stable housing, employment, and transportation; and to participate in family and individual counseling.

On August 1, the circuit court held a review hearing. At this hearing, the circuit court ordered the case plan goal remain reunification and that the minor children remain in the custody of the Department. The court also found Rachel in partial compliance with the case plan. At this time, Rachel was living at her sister's home, but her family said she could not have all the children there. Rachel had applied for HUD assistance and was on the waitlist. Rachel had a minivan in working condition, but it was not large enough to legally transport all the children at once. She had a full-time job at Sam's Club. The court found the Department had made reasonable efforts as well as reasonable efforts to place the minor children together or to maintain contact. The case plan that was created June 16, 2023, with a concurrent goal of adoption was accepted by the court and made part of the court's orders. This case plan required Rachel to participate in home visits, to obtain and maintain stable

4

and appropriate housing for herself and the children, to participate in in-home parenting education, to obtain and maintain appropriate access to transportation, to participate in family time, to participate in family counseling, and to participate in individual counseling. The court found Rachel was in partial compliance.

On October 31, 2023, and January 20 and March 4, 2024, the court held further review hearings. At each of these hearings, the court continued the goal of reunification and ordered the minor children to remain in the custody of the Department. At the October 31 review hearing, the court ordered Rachel to complete a budget with the Department and to provide it with a list of relatives to discuss possible placement of the children. At the January 2024 review hearing, the court ordered the Department to determine whether a safety plan could be established as to Rachel's father, who had a prior true finding for sexual contact with a minor and was named on Rachel's apartment lease at the time. Additionally, at the October 2023 and January 2024 review hearings, the court found Rachel partially compliant with the case plan, and at the March 2024 review hearing, the court found Rachel substantially compliant with the case plan. At the March 2024 review hearing, the circuit court noted Rachel had failed to appreciate the risks related to her father, which made it difficult to create a safety plan. The court also noted Rachel had given birth since the last hearing.

On May 7, 2024, the circuit court held a permanency-planning hearing. At this hearing, the circuit court continued the goal of reunification and ordered the minor children to remain in the Department's custody. The circuit court also found Rachel fully compliant

with the case plan. Additionally, a trial home placement was scheduled to begin May 31, 2024, for the four eldest children. However, testimony later established that the trial home placement was not entirely successful because Rachel failed to provide the Department with a transportation and childcare plan. Rachel's two eldest children were allowed to continue with the trial home placement.

On August 6, 2024, the court held a fifteen-month review hearing. At this hearing, the circuit court continued the goal of reunification and ordered the remaining seven minor children to remain in the Department's custody. Additionally, the court found Rachel in partial compliance with the case plan and court orders. Further, the circuit court ordered Rachel to re-engage with counseling services, complete a psychological evaluation, and develop a safety plan regarding her father.

On October 1, 2024, the circuit court held a second permanency-planning hearing. At this hearing, the circuit court again continued the goal of reunification and ordered the remaining seven minor children to remain in the Department's custody. The circuit court specifically found the eldest two minor children were on trial home placement, but the other minor children could not be placed with Rachel until she had a childcare and transportation plan. Additionally, the circuit court found Rachel in partial compliance with the case plan and court orders. Further, at this hearing, the circuit court made it clear that the minor children could not continue to be in "limbo," and the goal would be changed to adoption following termination of parental rights if improvements had not been made.

On November 19, 2024, the court held another permanency-planning hearing in which it changed the goal of the case to adoption and set reunification as the concurrent goal. The circuit court found the minor children could not be returned to Rachel even after eighteen months. The court found Rachel to be in partial compliance—there were still concerns with her lack of stable and appropriate housing, her lack of access to appropriate transportation, and the lack of childcare.

On March 7, 2025, the Department filed a petition to terminate Rachel's parental rights as to the five youngest children only. The Department alleged three grounds against Rachel: (1) that the children had been out of the home for at least twelve months, and she failed to correct the conditions causing removal; (2) that issues arose subsequent to the filing of the dependency-neglect petition that Rachel failed to remedy; and (3) that aggravated circumstances existed because there was little likelihood that services would result in reunification. The Department alleged termination was in the children's best interest because they would likely find permanency through adoption and because they would be subject to potential harm if returned to Rachel's custody because she could not find safe and appropriate housing, transportation, or childcare and was either unable or unwilling to remedy those issues.

On April 8, 2025, the circuit court held a hearing on the Department's petition. Carrington Fiddle, the primary caseworker, testified first. She testified to the ongoing barriers to Rachel's obtaining and maintaining safe and appropriate housing, including her limited financial resources, the number of children in her care, her prior negative rental

history, and an outstanding balance owed to the water company. She testified that while Rachel was able to secure housing in December 2023, the lease listed her father as a tenant, and due to his history of sexual abuse, the Department determined it was unsafe for him to be around the children. Although he did not reside in the home at the time of the termination hearing, he had lived there previously, and his continued presence on the lease gave him legal access to the residence, which made him an ongoing safety concern. She credited Rachel with significant consistency in her employment with Sam's Club but noted Rachel struggled with forming realistic financial plans. Fiddle testified the Department provided Rachel with SNAP assistance and assistance with resources for utilities. Fiddle testified that budgeting had been an ongoing challenge for Rachel and that the Department had worked with her on budgeting and identifying stable sources of income. Fiddle noted that while Rachel had been able to maintain her current home, she had been splitting the rent with her father, who was no longer contributing to rent since moving out the month prior. Fiddle explained that while the Department had worked with Rachel on a plan for placement of the youngest children, including transportation, safety, and supervision while Rachel was working, the plan was ultimately not realistic. She said the person who had been a major support to Rachel since the eldest children started the trial home placement was no longer available to help. As a result, the Department determined the four eldest children could remain in the home because they are old enough to be left alone. However, the youngest children could not be placed with Rachel because of concerns about her ability to adequately supervise them all at once and to provide basic needs for all the children. Fiddle

8

testified the children would be at risk of harm if returned to Rachel due to neglect if not appropriately supervised or provided with basic needs such as food, clothing, or shelter. She noted the case had been open for two years, and the same concerns remained throughout the entirety of the case.

Next, Rachel testified. She began by laying out a plan that had been formulated with the help of Youth Villages—a resource provided by the Department. This involved a primary plan, a backup plan, and a future school plan for the youngest children. However, much of Rachel's plan relied on family members who "were willing to help, but don't want to be responsible for the kids." Rachel discussed her full-time employment at Sam's Club, her discussions with management to increase her responsibilities and income and to utilize an employee-assistance plan, and her effort at picking up an extra job cleaning houses on her two days off each week while the children were in school. On cross-examination, Rachel admitted that one of the family members included in her plan had previously forgotten to pick the children up from school. She also admitted that no one person would be solely responsible, and the plan would change "day to day" depending on each person's availability.

At the conclusion of the hearing, the circuit court terminated Rachel's parental rights to the five youngest children only, reasoning that the four eldest children were old enough to care for themselves while Rachel was at work, and their schedules allowed them to help around the home. In the court's written order, it stated the grounds for termination of parental rights as "failure-to-remedy" and "aggravated circumstances"—little likelihood that

continued services to the family will result in successful reunification. Additionally, the circuit court found it was in the minor children's best interest to terminate parental rights.

## II. *Discussion*

On appeal, we review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Dade v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. *Jackson v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122.

Our case law recognizes that the termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Fox v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 666, 448 S.W.3d 735. In termination-of-parental-rights matters, the circuit court is required to follow a two-step process by finding first that the parent is unfit and second that termination is in the best interest of the child. *T.J. v. Ark. Dep't of Hum. Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997); *Smith v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2025). The second step requires consideration of whether the termination of parental rights is in the children's best interest.

Ark. Code Ann. § 9-27-341(b)(3)(A).  As a result, the Department bears a heavy burden in seeking to terminate the relationship of parent and child.  *Fox, supra.*

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.  Ark. Code Ann. § 9-27-341(a)(3).  Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.  *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 240, 201 S.W.3d 391 (2005).

### A. Failure to Remedy

Rachel first argues the circuit court erred in terminating her parental rights because the circuit court's finding of "instability" is just poverty in disguise.  Specifically, Rachel argues that poverty is not a legally supportable basis for termination, so this court should reverse the termination of her parental rights.  We disagree with Rachel's characterization of the circuit court's ruling and affirm.

Proof of only one statutory ground is sufficient to terminate parental rights.  *Freedman v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 514, at 14–15, 679 S.W.3d 420, 428.  We will focus on the failure-to-remedy ground, and because the evidence is sufficient to prove that ground, there is no need to discuss the aggravated-circumstances ground for termination.  To prevail on the failure-to-remedy ground, the Department must demonstrate (1) the child was adjudicated dependent-neglected; (2) the child remained out of the custody of the parent

for twelve months; (3) the parent failed to remedy the cause of removal; and (4) this failure occurred despite meaningful efforts by DHS to rehabilitate the parent and correct the issue that caused the removal. Ark. Code Ann. § 9-27-341(b)(3)(B)(i).

In this case, Rachel's nine minor children were adjudicated dependent-neglected, and despite the Department's meaningful efforts, the five youngest minor children remained out of Rachel's custody for more than twelve months. The court heard testimony that the Department provided services to Rachel to help remedy the issues of housing, employment, and transportation, including things such as groceries, transportation for the children, medical care for the children, foster-care placement for the children, and monthly home visits. Rachel stayed with various family members until she obtained an apartment that required her father to cosign the lease. However, Rachel previously admitted she had concerns regarding her children's safety around her father due to a previous true finding for sexual touching of a child. Despite this, Rachel did not attempt to obtain housing that did not require her father to cosign the lease or create a safety plan to protect the children in the event her father came to the apartment while the children were unsupervised.

While the eldest four minor children had a successful trial home placement with Rachel, the same cannot be said for the youngest five. During the pendency of this case, the Department attempted a trial home placement for the five youngest children, but ultimately Rachel's failure to provide a transportation plan or a childcare plan for the children while she was at work rendered the Department unable to move forward with the trial home placement. Although Rachel retained the rights to her four eldest children whose ages

12

ranged from ten to fifteen years—at the time of termination, Rachel continued to lack appropriate housing and the ability to provide for the essential needs of the five youngest children. The court reasoned the four eldest children could remain in Rachel's custody because they were able to stay by themselves while Rachel worked, and their schedules allowed them to help Rachel around the house. However, when the time came, Rachel did not demonstrate that she could meet the essential needs of the youngest five children, including stable housing, transportation, and childcare.

The goal of termination proceedings is to provide permanency in a child's life when returning the child to the family home is contrary to the child's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *Meriweather v. Ark. Dep't of Hum. Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007). A child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances. *Dozier v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 17, 372 S.W.3d 849. Here, this case went on for two years without Rachel correcting her failure to provide essential needs for the children despite the multitude of services offered to her. A stable home is one of a child's most basic needs. *Selsor v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 182, at 6, 516 S.W.3d 314, 318. A parent's continued inability to protect and care for his or her child and failure to benefit from the services provided demonstrate little likelihood that further services will result in a successful reunification. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374,

13

554 S.W.3d 285. Considering the facts before us, we hold that the circuit court did not clearly err in finding by clear and convincing evidence that the failure-to-remedy ground supported the termination of Rachel's parental rights.

## B. Best Interest

In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, at 9–10, 379 S.W.3d 703, 708–09. Adoptability is not an essential element; rather, it is a factor that the circuit court must consider. *Tucker v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 430, at 7, 389 S.W.3d 1, 4–5. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine*, 2010 Ark. App. 781, at 11, 379 S.W.3d at 709. The potential-harm analysis is to be conducted in broad terms and in a forward-looking manner. *Shawkey v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 2, at 5, 510 S.W.3d 803, 806.

Rachel does not challenge the circuit court's findings regarding adoptability or potential harm. Therefore, we need not consider those issues. *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604. Rather, Rachel argues the circuit court failed to properly account for statutory protections regarding the sibling relationship while making its best-interest determination. To make a sibling-relationship argument that supports reversal, there must be evidence of a genuine sibling bond, which was not demonstrated in the record here. *E.g., Martin v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 192, at 6, 596

14

S.W.3d 98, 102 (holding that keeping siblings together is an important consideration but is not outcome determinative because the best interest of each child is the polestar, and evidence of a genuine sibling bond is required to reverse a best-interest finding on the basis of the severance of a sibling relationship).  Additionally, the statute on which Rachel relies, Ark. Code Ann. § 9-9-215 (Supp. 2025), concerns the adoption of siblings, not termination of parental rights.  Because we are not left with a definite and firm conviction that a mistake has been made, we hold the circuit court did not clearly err in finding that termination was in the best interest of the five youngest children.  Accordingly, we affirm the order terminating Rachel's parental rights.

Affirmed.

KLAPPENBACH, C.J., and HIXSON, J., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.

15